254 U.S. 196 (1920)
CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY ET AL.
v.
DES MOINES UNION RAILWAY COMPANY ET AL.
DES MOINES UNION RAILWAY COMPANY ET AL.
v.
CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY ET AL.
Nos. 66, 67.
Supreme Court of United States.
Argued March 23, 24, 1920.
Decided December 6, 1920.
CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.
*199 Mr. Robert J. Cary and Mr. Burton Hanson, with whom Mr. John C. Cook, Mr. Winslow S. Pierce, Mr. Lawrence Greer and Mr. F.C. Nicodemus, Jr., were on the briefs, for Chicago, Milwaukee & St. Paul Ry. Co. et al.
Mr. James L. Parrish and Mr. Frederick W. Lehmann for Des Moines Union Ry. Co. et al.
MR. JUSTICE PITNEY delivered the opinion of the court.
This was a suit in equity brought in the year 1907 in the Circuit (now District) Court of the United States for the Southern District of Iowa by the Chicago, Milwaukee & St. Paul Railway Company and the Wabash Railroad Company against the Des Moines Union Railway Company. By an amended bill the individual defendants, Frederick M. Hubbell, Frederick C. Hubbell, and their firm of F.M. Hubbell & Son, were brought in; and afterwards the Wabash Railway Company, having succeeded to the rights of the Wabash Railroad Company, was substituted as a complainant in its stead. Jurisdiction depended entirely upon diverse citizenship of the parties.
Complainants own and operate lines of railroad extending to the City of Des Moines, Iowa, and connecting there with a joint terminal property, legal title to which is held by the defendant Des Moines Union Railway Company (hereinafter called for convenience the terminal company), in which complainants hold a minority of stock, the Wabash Company an eighth, the other complainant a quarter, *200 while the Messrs. Hubbell hold five eighths. Complainants assert that the terminal company holds its property in trust for their use, and that they are the sole beneficial owners, having an equitable tenancy in common, and being entitled to the joint use of the property in perpetuity, exclusive except as other railroads may be admitted to participate in such use with their consent. This is the principal matter in controversy. Intimately connected with it is the question of the validity as against complainants of the Messrs. Hubbell's claim to ownership of five eighths of the capital stock. A subordinate issue relates to the disposition of what are called "surplus earnings," acquired by the terminal company from outside parties during the operation of the terminal under an agreement made in the year 1889 between the terminal company and the predecessors of complainants and which expired in 1918.
Complainants base their principal contention upon a trust alleged to have been established under and pursuant to an agreement made January 2, 1882, between three companies then engaged in the construction of as many railroads converging at Des Moines, and through the incorporation of the terminal company in the year 1884 for the express purpose of acting as trustee for the three companies, and the conveyance to it by them of the terminal property, followed by the working agreement of 1889; from all of which it is contended that the terminal company has from the beginning held and still holds all its property subject to a trust under which the three railroad companies and their successors and assigns, and such other railroad companies having lines terminating at Des Moines as may be admitted with their consent, are entitled to have the terminal property maintained and operated for their use and benefit at the actual cost of the terminal service performed. Complainant Chicago, Milwaukee & St. Paul Railway Company is the remote *201 successor of two of the three companies, owning what may be called the Northern and the Northwestern lines. Complainant Wabash Railway Company is the remote successor of the original company that owned the third, which may be called the St. Louis line. The bill of complaint prayed for a decree declaring and establishing the trust; an accounting for all income and profits received by the terminal company for switching or handling traffic at the terminal for companies other than complainants and their predecessors, and for rentals of real estate and the like; and specifically and generally for other appropriate relief. The defenses set up in the answer and attempted to be supported by the proofs are, briefly, that by the deeds of conveyance made to the terminal company it took title not as trustee but absolutely and for its own sole use and benefit; that, whatever relation may have arisen from the provisions of the original articles of incorporation, whether fiduciary or merely contractual, was substantially modified, and if fiduciary terminated, by amendments adopted April 8, 1890, alleged to have been thereafter recognized by complainants and their predecessors as valid and so treated by defendants and all others concerned; that complainants by their conduct and that of their predecessors are estopped from setting up the equitable title alleged, and have been guilty of laches barring relief in equity; hence that they are not entitled to assert any right or interest in the terminal property except such as arises from their ownership of a portion of the stock of the terminal company and from the provisions of the agreement of 1889; and that by the proper construction of that agreement the so-called surplus earnings are the property of the terminal company and not of complainants.
Upon final hearing the District Court made a decree from which both sides appealed to the Circuit Court of Appeals, where it was held (one judge dissenting) that *202 the terminal company had complete and absolute title to the terminal property; that complainants, except as holders of its stock or bonds, had no interest in it, nor voice in the control or management; that by the true construction of the 1889 agreement complainants were entitled to the surplus earnings until May 1, 1918, and that thereafter the rights of the parties respecting the use of the terminal were only such as sprang from their nature as carriers and their physical and business relations to each other and to the terminal; by reason of which the terminal company must furnish them with reasonable terminal facilities at reasonable charges to be agreed upon, or in default of agreement to be fixed by the proper public tribunal. 254 Fed. Rep. 927.
Cross-writs of certiorari bring the resulting decree here for review.
The facts are intricate, and the evidence so voluminous that any detailed recital of it would be unduly tedious. It is sufficiently referred to in the prevailing and dissenting opinions delivered in the Circuit Court of Appeals, and we will content ourselves with touching upon the salient points. The case involves no abstruse legal or equitable doctrine; the application of familiar principles to the facts as they are developed will direct us to the proper outcome.
The agreement of January 2, 1882, was made between the three railroad companies and two individuals in whose names certain titles had been taken for the benefit of the companies. Its principal provisions were that terminal facilities in Des Moines should be purchased, constructed, and maintained at the joint expense of the three companies and held and used in common; that the expense of acquisition should be borne one-half by the St. Louis Company, one-quarter by each of the others; "that a depot company may be organized and may take permanent charge of the property upon the terms herein set forth, and *203 that said company may issue and deliver to the companies, parties hereto, its mortgage bonds to the amount of their respective portions of the cost of the said purchases and improvements. . .. The title to said property shall be and remain in a trustee to be named by agreement of said companies, but subject to the joint use and occupation of all of said railway companies upon the terms herein described." The St. Louis Company was to be charged with police control, supervision, and maintenance of the terminal, and the expense thereof (including taxes) apportioned between it and the other companies according to the use they should respectively make as evidenced by the wheelage; spur tracks were to be built connecting the terminal with factories and other sources of trade in and about the city, but if either of the companies should deem the construction of any such track not advantageous the question of constructing it and which of the three companies should pay for it was to be determined by arbitration; any railroad company having a line not extending to Des Moines but having effected an arrangement for running its trains into the city over the line of either of the three companies was to be entitled to the use of the terminal facilities upon paying a fair sum for rental and a proportion of the maintenance account, the rental to inure to the three companies in the same proportion as the original outlay, and the sum due for maintenance to be determined in the same manner as in the case of the three companies; railroad companies having lines extending into Des Moines might be admitted to the use of the terminal by agreement of all three companies; differences arising under the agreement were to be referred to arbitration.
The terminal company was organized by representatives of the three companies under articles of incorporation dated December 10, 1884, which recited the 1882 contract in full, with special emphasis upon the provision that a *204 depot company might be organized to take permanent charge of the property, and declared that the new company was organized for this purpose as well as others that were expressed. The articles contained apt provisions to comply with the laws of the State of Iowa so as to enable it to construct, own, and operate a railway in, around, and about the city, with depots and everything else useful and convenient for the operation of railways at the terminal point, and with all the powers conferred upon corporations for pecuniary profit. Its corporate existence was to continue for fifty years, with the right of renewal. It was expressly declared: "All the powers exercised by this company shall be in accordance with the terms and spirit of the aforesaid contract entered into on the 2nd day of January, A.D. 1882." There was a provision that the written assent of the three companies should be necessary before the terminal company should lease or otherwise dispose of the use of any part of its franchises to any other railroad company. The capital stock was to be $1,000,000, divided into shares of $100 each, and paid in as the board of directors might determine, with authority to the board to receive in payment the property and franchises in Des Moines held by the three companies and their trustees. Four members of the board of directors were to be nominated by the St. Louis Company, two members by each of the other proprietary companies, and no stockholder to be eligible for membership in the board unless so nominated; this provision to apply to and be enjoyed by any grantee or assignee of either of the three companies. No contract, lease, or other agreement amounting to a permanent charge upon the property of the corporation to be entered into unless first approved by the three companies or their assigns and by more than three-fourths of all the stockholders.
January 1, 1885, each of the three companies held a stockholders' meeting, at which formal resolutions were *205 adopted reciting the contract of January 2, 1882, and the organization of the terminal company as contemplated in that contract and in order to carry out its purpose; each company thereby accepting and ratifying, so far as its interests were affected, the articles of incorporation of the terminal company as in substantial accord and compliance with the terms and conditions of the contract, and authorizing its officers to transfer to the new company all its right, title, and interest in the terminal property in exchange for a proper share of the bonds and stock of the terminal company.
On the same day the board of directors of the terminal company adopted resolutions accepting the transfer, management, and operation of the terminal property, appointing a committee to confer with the three railroad companies with respect to the terms and price at which the terminal property and franchises should be conveyed to it, and to procure from them "such conveyance and transfer as may be necessary to fully invest this company with the title, control and management of said properties as provided for in said contract of January 2nd, 1882"; and authorizing the issue of all its capital stock and not exceeding $500,000 of bonds to be secured by mortgage of the properties so to be conveyed; the bonds and stock to be used in paying for the property, maintaining, operating, and improving it, and purchasing other property necessary to carry out the objects of the company.
Due apparently to the financial embarrassment of the original Wabash Company, which dominated the St. Louis and the Northwestern, terminal matters remained in abeyance until November, 1887, when deeds were authorized, which, between that time and the following April, were made by the companies and the individual trustees with the effect of vesting in the terminal company complete legal title to the properties that had been acquired for the purpose of establishing the terminal. The *206 deeds were absolute in form. The terminal company by amendment of its articles increased its capital stock from $1,000,000 to $2,000,000, and authorized the making of a mortgage, which afterwards was given as of date November 1, 1887, to the Central Trust Company of New York as trustee, to secure an issue of $800,000 of 5 per cent. bonds for the purpose of paying for its property and completing improvements thereon; the mortgage covering all its real estate, rolling-stock, etc., then owned or thereafter to be acquired.
Until May 1, 1888, the terminal property continued to be operated by the St. Louis Company under the original agreement; on that date the terminal company took possession, and ever since then has continued to operate it and render terminal service thereon to the three railroad companies and their successors, as well as to other companies admitted from time to time under special agreements.
Upon a review of all the evidence, construing the writings in the light of the circumstances and the manifest purpose and intent of the parties, we are clear that the effect of the transactions thus far recounted was to establish a trust in the full and proper sense of the word, the terminal company being invested as trustee with complete legal title, but without beneficial ownership, and subject to a duty to maintain and operate the property and exercise all its corporate powers for the common use and benefit of the three railroad companies, their successors and assigns, and such other companies as might be admitted by them to a proprietary participation in the terminal.
The gist of defendants' argument to the contrary is that the incorporation of the terminal company and the conveyance of the property to it by deeds absolute in form manifested a substantial change of plan from that embodied in the contract of January 2, 1882; stress being laid *207 upon the fact that the powers of a terminal railway company as acquired under the articles of incorporation were much more extensive than those of a depot company, and it being contended that the provisions of the articles respecting the control of the terminal company and the resolutions providing for the transfer of the property to it, the form of the deeds themselves, and the issuance of stock and bonds to the proprietary companies in payment, demonstrated a purpose to invest the terminal company with title for all purposes. But the main object of establishing a joint terminal at the common expense and for the common use of the three companies and to retain their proprietary interest in it while confiding its maintenance and operation to their trustee is so manifest that all the proceedings are properly to be construed as designed to give effect to it, and seeming inconsistencies and ambiguities resolved accordingly. The provision of the articles that "all the powers exercised by this company shall be in accordance with the terms and spirit of the aforesaid contract" is not merely contractual, but amounts to a declaration of trust and together with the other evidence shows clearly that the powers were procured from the State expressly to enable the company the better to fulfill the purposes of its existence as such trustee, and not to set it up in business on its own account. The substitution of the terminal company with more elaborate powers in place of the depot company contemplated at the beginning shows a development and modification of the original plan, but no departure or substantial change. The particular stipulations contained in the articles respecting the control of the terminal company were intended not as a substitute for but as safeguards of the trust. The absolute form of the conveyances, and the issuance of stock and bonds "in payment," were intended to give credit to the company in its dealings with outside parties and to render its bonds more readily salable; but they constituted the *208 mere mechanism for carrying into effect the main purpose of the parties, and as between them were controlled by that purpose and by the articles and resolutions that manifested an express declaration of the trust. All the circumstances, and what we have quoted from the resolution of the terminal company directors, show that the title was conveyed for the purpose of enabling that company to control and manage the terminal in furtherance of the objects of the 1882 agreement.
It needs no particular form of words to create a trust, so there be reasonable certainty as to the property, the objects, and the beneficiaries. Colton v. Colton, 127 U.S. 300, 310. But if, as here, the subject of the trust be a legal interest in property and capable of legal transfer, the trust is not perfectly created unless the legal interest be actually vested in the trustee. Adams v. Adams, 21 Wall. 185, 192, 194. Hence the necessity in this case of deeds conveying the fee to the terminal company. But it is not necessary that the trust be expressed in the same instrument that transfers the title. Various instruments may be read together in order to ascertain the intention to establish one. Loring v. Palmer, 118 U.S. 321, 340.
The agreement of May 10, 1889, between the terminal company of the first part and the three proprietary companies of the second part fixed the terms upon which the property should be managed and the terminal service performed for a period of thirty years to date from May 1, 1888. It constituted a working arrangement for that period, but did not in terms or by implication set aside the trust or place a time limit upon it. It provided that for the terminal service the proprietary companies should make payments, in proportion to the wheelage of each, to cover interest upon the mortgage bonds, the cost of maintenance, repairs, taxes, and insurance, and the cost of operating the terminal, including all expenses (except the operation of engine-houses, care of engines, and repairs *209 thereto, which were separately dealt with), after deducting any amounts which other railway companies might be obliged to pay for the use of the property. Engine-house expenses were to be apportioned according to the number of engines of each company, engine repairs to be charged to the company for which the work was done. The agreement contained other provisions of permanent effect, providing for the allotment of the stock of the terminal company to the proprietary companies and declaring the terms upon which outside companies might be admitted to ownership of the stock or the use of the property. It recited that the proprietary companies were entitled to the stock in the proportion of one-half to the St. Louis Company, one-fourth to each of the others, and provided for the issuance of certificates accordingly, and that these should express upon their faces that they were not transferable without the consent in writing of all the proprietary companies, except as to shares issued to qualify directors. And there was a provision that the St. Louis Company might sell one-half of its stock, or one-quarter of the whole, to such railroad company as might be acceptable to a majority of the proprietary companies, in which case the purchasing company might be admitted as one of the parties to the agreement upon the same terms and conditions as those stipulated for the other parties of the second part; and that, except as thus provided, other railroad companies should not be admitted to the use of the terminal property without the consent of all the parties of the second part.
Here again we have a further modification of some of the details of the original plan, but in respects altogether consistent with the continuance of the trust; inconsistent, indeed, with a purpose to treat the terminal company as an independent entity subject only to contractual obligations and remit the proprietary companies to the ordinary rights of stockholders. Their contributions to the original cost *210 of the property having been secured by mortgage bonds according to the plan of 1882, provision was now made for distributing the entire capital stock according to the original proportions, one-half to the St. Louis, one-quarter to each of the two other companies, but with certain material restrictions upon the ordinary rights of stockholders expressed in the agreement and others necessarily implied.
Since, from the very nature and terms of the trust, all the property and franchises of the terminal company were to be held for the benefit of the proprietary companies, and all its corporate powers exercised in the administration of the joint terminal for their common use, the stockholding interest in the terminal company necessarily must be modified, as between the parties, to the extent necessary to give full effect to the trust. In the hands of the proprietors of the connecting lines the stock was the evidence of their right to participate in the benefits of the trust, in the control and management of the terminal company, and in the use of the terminal; but such use, in the nature of things, must be proportioned, not according to the magnitude of their respective stock holdings, but according to their respective traffic requirements. And since the terms of the trust required that these connecting lines should have the entire beneficial use of the property upon paying the cost of the terminal service, there was no room for a profit from the operations of the terminal company out of which dividends could be paid. Except in the theoretically possible but extremely improbable event of an abandonment of the terminal (as to the effect of which no opinion need be expressed), it is plain that, as between the parties to the trust and others having notice of it, the stock could have little or no exchange value except to a company owning or operating a railroad line connecting or capable of connecting with the terminal. In the hands of others having notice of the trust, the stock represented no substantial *211 property interest. Some recognition of the anomalous status of the stockholding interest is to be found in the acts of the parties above set forth, especially in the provisions of the agreement of 1889. The amount of stock provided for shows that it was deemed probable that eventually the property would have a value in excess of the original cost represented by the bond issue, or that value might be given to the stock through liquidation of the bonds or otherwise, and that upon a sale of a participation in the terminal property and facilities to an outside railroad company, evidenced by a transfer of stock in the terminal company, some return could be got for such increased value. The apportionment of the original issue, and the stipulations of the 1889 agreement, recognized that the St. Louis Company, as representative of the original Wabash Company, was equitably entitled to preference in any profits that might be derived from such a sale to an outside company. And evidently it was then anticipated that there would be four proprietary companies, each holding one-fourth of the stock, with equal representation in the board of directors.
We are not here concerned with any question pertaining to the rights of the bondholders. It may be assumed that, if necessary for their protection, the mortgage would be treated as conveying the entire estate, both legal and equitable, in the terminal property. No express provision appears to have been made for paying off the principal of the bonds. Whether the beneficiaries of the trust, as between themselves, were or are entitled to have provision made for discharging the principal by including periodic amortization charges as a part of the cost of operating the terminal is a question that we need not consider.
Nor are we at this moment concerned with any question that might arise if stock of the terminal company had come or should come to the hands of a bona fide purchaser for value without notice. The principal controversy *212 arises from the fact that defendants F.M. Hubbell and F.C. Hubbell have become the holders of five-eighths of the capital stock, upon which fact, together with the alleged effect of the amendments to the articles of incorporation adopted April 8, 1890, defendants rest the insistence that the proprietary companies have lost their right to control the action of the terminal company, that the Messrs. Hubbell as stockholders are entitled to control it and to have dividends out of its profits, and that from and after the expiration of the 1889 agreement, complainants have no right to the use of the terminal except upon terms to be agreed upon by the terminal company as controlled by the Messrs. Hubbell.
It is important, therefore, to consider the circumstances under which their stock was acquired and the amendments adopted.
Obviously the fiduciary character of the terminal company extended to its officers and directors as to all others concerned in its management, charging them with a duty to uphold the trust and imposing upon them the usual disability about reaping a personal advantage at the expense of the beneficiaries. And it is clear and undisputed that the Messrs. Hubbell acquired their stock with full notice of all essential facts pertaining to the trust; they themselves at all times material were officers and directors of the terminal company and acted in a fiduciary capacity in everything relating to its affairs. Mr. F.M. Hubbell was an officer and director of that company at the beginning and continuously thereafter, especially active in its management; and during a period which included the important transactions in question he also was a director and officer of each of the proprietary companies and their trusted representative in respect to terminal matters at Des Moines. Mr. F.C. Hubbell became a director of the terminal company in January, 1890, president two years later, and has been such continuously since.
*213 In the year 1886 and thereafter until and during the year 1890 the property of the Wabash system, including the stock of the St. Louis Company with control of its part of the stock of the terminal company, was in the hands of a purchasing committee as trustees for the Wabash bondholders. In February, 1890, F.M. Hubbell obtained from this committee an option for the purchase of $135,000 of the terminal company bonds and a quarter interest in its capital stock for $135,000, accepted the option, made over to General Dodge a half interest in it, and Hubbell and Dodge each received one-half of the specified bonds and one-eighth of the outstanding capital stock, with a guaranty on the part of the purchasing committee that the St. Louis Company would approve the transfer (as it afterwards did, through its board of directors), and that the committee would consent to such change in the articles of incorporation of the terminal company as would permit one director to be nominated by any person or company holding one-eighth of the stock. At this time General Dodge was president of the terminal company, and also president and principal stockholder of the Northern Company; Hubbell, besides his relation to the terminal company, was president of the Northwestern Company and its controlling stockholder. In correspondence between Mr. Hubbell and the purchasing committee antecedent to this transaction they warned him that it would be necessary to confine a sale of stock "to such railway companies as would be interested in the station"; and he assented to this, acknowledging that "it would be prejudicial to sell any of this stock to outsiders, and I understand it as you do that the stock cannot be sold without the consent of the different railroad companies who now form the terminal company." Later Hubbell acquired from the purchasing committee $50,000 of the bonds and an additional eighth interest in the capital stock of the terminal company for $57,736, being *214 par and accrued interest for the bonds and 15% of par for the stock, upon the understanding expressed in writing that an eighth interest should be "sufficient to represent a proprietorship in the company, according to the understanding we had when you were here"  evidently meaning that the eighth retained by the purchasing committee should carry with it a proprietary interest and influence in the terminal not limited in proportion to the amount of the stock.
Defendants insist that because the purchasing committee sold the stock to Hubbell and Dodge for a valuable consideration, they must be taken to have dealt with it as having substantial value; and that since, in afterwards making report to the board of directors of the Wabash Company, with an account of their financial transactions, the committee included their receipts from sales of the stock and bonds of the terminal company, and the directors approved the account, complainant Wabash Railway Company is estopped from denying that Hubbell and Dodge acquired a substantial and valuable interest in the terminal company. We deem it clear, however, that the intent of the purchasing committee, known and assented to by Hubbell and Dodge at the time, was merely to enable the latter to sell the three-eighths interest to some railroad company capable of participating in the use of the terminal. Whether consistently with their fiduciary relations or not, they took advantage of this opportunity in the following year, when the Northern and Northwestern companies were consolidated and they sold to the consolidated company the stock in question, apparently and presumably at a profit over and above what they paid the purchasing committee for it. There is no foundation for the suggested estoppel.
The title now asserted by the Messrs. Hubbell to five-eighths of the terminal company stock was derived not directly from the Wabash purchasing committee, but from *215 the consolidated Northern and Western company. That company, in addition to the three-eighths transferred to it by Hubbell and Dodge, had the two quarter-interests originally owned by those companies, making seven-eighths in all. In October, 1893, the consolidated company pledged to F.M. Hubbell & Son five-eighths of the terminal company stock (2,500 shares) as security for a debt. The stock was transferred to the Hubbell firm on the books at that time, and so remained down to the institution of this suit, except as to five "qualifying shares" placed in the names of individuals but controlled by the firm. On January 29, 1894, the indebtedness was settled between the directors of the consolidated company and the Messrs. Hubbell upon terms that included a purchase by the latter of the 2,500 shares of terminal company stock at ten per centum of its par value. Passing for the moment certain special grounds of attack upon the title they thus acquired to these shares, it is obvious that they took them subject to all qualifications arising out of the trust that pertained to the property and franchises of the terminal company.
The quarter-interest in the terminal company stock retained by the consolidated company afterwards passed from it to the complainant Chicago, Milwaukee & St. Paul Railway Company, which acquired at the same time the Northern and Northwestern lines. That company took with notice of the claim of the Hubbells to a five-eighths interest; but this does not estop it from disputing the validity of their claim, nor from setting up, as in this suit, whatever beneficial participation in the trust respecting the terminal property may be incident to its ownership of one-fourth of the stock of the terminal company together with connecting lines of railroad, and asking for relief against any inequitable use by the Hubbells of the five-eighths interest claimed by them.
As to the amendments to the articles of incorporation: These are alleged to have been adopted at a meeting of *216 the stockholders of the terminal company held April 8, 1890. Their purport was, briefly, to omit from the articles the copy of the contract of 1882 recited therein, the declaration that the powers exercised by the company should be in accordance with the terms and spirit of that contract, and the requirement that assent in writing of the proprietary companies should be necessary before any disposition of the franchises of the terminal company should be made; to set aside previous proceedings respecting the amount of capital stock to be issued to the proprietary companies and provide for the distribution of a much decreased amount ($400,000 par instead of $2,000,000) but in the same proportions as before, the remaining capital stock ($1,600,000 par) to be issued only by resolution of the stockholders adopted by vote of more than seven-eighths of all the stock theretofore issued; and to eliminate the former method of selecting directors and provide that they should be elected by the stockholders, but that it should require the votes of more than seven-eighths of all the stock to elect a director, and that as to all matters except the ordinary operation of the property the directors could act only upon unanimous vote of the eight members of the board. One of the articles adopted purported to repeal, strike out, and expunge the proceedings of a stockholders' meeting held December 10, 1884, at which the original articles of incorporation were adopted.
It is plain enough, and is conceded, that the corporation could not, by merely altering its own internal organization, affect the interests of its cestuis que trustent. It is as evidence of a modification of the agreement between the stockholders of the terminal company  themselves beneficiaries of the trust  that the amendments are invoked. So regarding them, the question is, by what authority and with what intent were they adopted? The stockholders' meeting was attended by six individuals (including the two Hubbells), and two others by proxy, each of *217 whom assumed to represent, and in a general sense did represent, one or the other of the three proprietary companies. F.M. Hubbell himself was president of the Northwestern Company and assumed to represent it. Others present were the vice president of the Northern and the president of the St. Louis companies. The evidence fails to show that those present had express authority to act for the proprietary companies in amending the articles; and action of this kind  materially affecting the property interests of the three companies in a matter so vital as the ownership and control of an important terminal  was so far out of the usual or ordinary course of business that authority to represent their corporations in assenting to it was not to be implied as coming within the general scope of their duties. Nor did either of the proprietary companies, by any formal corporate action, accept or ratify the amendments.
Moreover, it affirmatively appears, and both courts below in effect found, that there was no actual intent on the part of any of the parties concerned to affect the substantial rights or equities of the proprietary companies, or to terminate, repudiate, or substantially modify the trust respecting the terminal property. It does appear that some of those active in proposing the amendments, and assuming to act for the proprietary companies in assenting to them (there is a question whether they actually were adopted by a proper vote of the stockholders, but we do not go into this), were under the impression that the contract of 1882, recited in the articles of incorporation, already had been abrogated and the trust set aside by the issuance of the terminal company's bonds and apportionment of the stock to the proprietary companies in payment for the property conveyed and by the making of deeds absolute in form; that both in respect to the ownership of the property and the management of it under the contract of 1889 the original arrangement had been abandoned; and *218 that it was desirable to amend the articles so as to make them conform to the situation actually existing.
Clearly, this was a mistaken impression, as will appear from what we have said. It was a mistake not indeed as to any mere matter of fact, nor on the other hand as to any pure question of law, but rather as to the existing legal rights, interests, and relations of the parties resulting from antecedent transactions. Whether it was such a mistake as to furnish ground for a cancellation of the amendments in equity, is a question into which we need not enter. (See Snell v. Insurance Co., 98 U.S. 85, 90; Griswold v. Hazard, 141 U.S. 260, 284; Utermehle v. Norment, 197 U.S. 40, 56; Philippine Sugar Co. v. Philippine Islands, 247 U.S. 385, 389; Pom. Eq. Jur., §§ 841-849.) For the fact that those who assumed to act for the proprietary companies in assenting to the amendments were mistaken as to the existing legal situation, so that the amendments, if given effect according to their terms, instead of bringing the articles into conformity with the situation already actually existing, would materially change the situation to the disadvantage of the proprietary companies by putting an end to an important trust contrary to their actual intent as parties beneficially interested, is a cogent reason for holding as we do that authority on the part of agents to assent to such amendments is not to be implied where it was out of the ordinary course of business and express authority was not conferred.
In support of the contention that the terminal property was not subject to any trust either before or after the amendments, defendants cite a series of contracts in which the terminal company asserted its ownership without qualification, and of conveyances, mortgages, etc., by the proprietary companies recognizing the legal title of the terminal company to its property and asserting in themselves only a title to shares in the terminal company. But when a trust is once established and acknowledged it does *219 not need to be constantly reiterated or confessed. None of the instruments referred to is in anywise inconsistent with the trust; the contracts of the terminal company were made in the very course of its administration of the trust; and the mortgages and conveyances of the proprietary companies dealt with legal titles only, their equitable interests in the terminal passing without mention as incidental to their ownership of the stock together with the connecting lines.
The majority of the Circuit Court of Appeals held that the control of the proprietary companies was relinquished by reason of the amendments and the conduct of the parties at the time and thereafter, upon this theory: that although the amendments were neither previously authorized nor afterwards formally accepted or ratified by the three companies, yet since their executive officers were aware of and approved the action of the meeting; since Hubbell was encouraged to purchase the bonds and stock, the value of the stock being wholly prospective; since after the amendments the stock of the terminal company was issued in accordance therewith and directors elected by the new method, the railroads making no attempt to exercise their right of naming directors in certain proportions as before; since for seventeen years the railroads acted, as it seemed to the court, in harmony with the amended articles, not questioning their validity until this suit was commenced; they could not, after such delay, enforce their rights in a court of equity against defendants who to their knowledge had acted upon the belief that such rights did not exist, and had acquired and held property which had largely increased in value in the interval. It was held that this result had come to pass although the railroads never had intended it; that the sale of a part of the Wabash stock by the purchasing committee to Hubbell and Dodge, then influential in the two other roads, would seem at the time a mere rearrangement of the interests of *220 the three companies in the terminal company; but that the effect of the amendments was a severance of the control of the roads over the terminal company, and subsequent events confirmed this, so that when the Hubbells disposed of their interests in the Northern and Northwestern to the Milwaukee, retaining for themselves a majority of the terminal holdings, the result was that the railroads themselves had gradually let slip that exclusive ownership and control which at the beginning they had so much valued and so carefully guarded.
Convinced that the relation of the parties was fiduciary and not merely contractual, we are unable to accept the view thus outlined. It would require a clear case to warrant a court of equity in declaring that the trustees of an express trust, in the very course of their administration of the trust, had acquired a dominant interest in the trust property and in effect a discharge of the trust, through mere inattention or even negligence  not raising an estoppel or amounting to laches  on the part of the parties beneficially interested, or of their executive officers. Conduct merely equivocal, or apparently inconsistent with a vigilant insistence upon the obligations of the trustee, is not sufficient to discharge a trust. The cestui que trust is entitled to rely upon the fidelity of the trustee, until plainly put on guard against him. And the trustee is at all times disabled from making a profit for himself out of any dealings in the trust property without the express consent of the cestui que trust.
Nothing appears to create an estoppel against complainants. Neither they nor their predecessors have misled defendants to their disadvantage. The purchasing committee accepted a money consideration from Hubbell and Dodge for the transfer of a block of stock. But the purchasers had more complete and intimate knowledge of the situation than the committee had, and were specially put on notice, as the correspondence shows. Indeed, their *221 knowledge of the true nature and office of the terminal company constituted adequate notice. And again, when the Messrs. Hubbell reacquired the same three-eighths with an additional one-quarter interest from the consolidated Northern and Western Company, they were as before chargeable with full notice of all the facts out of which the equities of complainants arise.
The question of laches presents more difficulty; but after mature consideration we are convinced that it must be resolved in favor of complainants. Acquiescence by the executive officers of the proprietary companies in the changed situation resulting from the amendments of April 8, 1890, is stressed by counsel for defendants, as it was in the majority opinion of the Circuit Court of Appeals; it being pointed out that after the amendments directors were elected in the new mode, and that in an agreement of ratification dated July 31, 1897, made for the purpose of giving recognition to the participation of the Wabash and of the consolidated Northern and Western Company in the obligations of the 1889 agreement, it was declared that so much of that agreement as related to the issuance and distribution of the capital stock of the terminal company was no longer binding, and the stock was held in specified proportions, including "F.M. Hubbell & Son 2,500 shares." This was a recognition of their status as de facto stockholders, but not a concession that the fiduciary character of the terminal company had been changed, or that the stock possessed any quality or value other than was consistent with the nature and terms of the trust. The parties acted in harmony with the amended articles so far as the internal organization of the company was concerned, but the company remained in possession of the property as before and continued to manage it in accordance with the terms of the agreement of 1889. Such possession was as consistent with a continued recognition of the trust as with the opposite; and it does not appear *222 that at any time until shortly before the bill was filed defendants contended that the amendments amounted to an express repudiation of the trust or that the terminal company would be free from obligation at the expiration of the agreement. Prior to this there had been a difference about the disposition of the "surplus earnings," but this was no more than a question about the proper construction of the working agreement.
It seems to us the court below attributed undue weight to the conduct of the executive officers of the proprietary companies indicating acquiescence in a supposedly changed situation resulting from the amended articles. It would not be surprising if occasionally there was a failure to appreciate fully and accurately the rights and obligations growing out of the trust. But the Messrs. Hubbell, because of their fiduciary relation, are estopped from laying hold of the incautious, negligent or mistaken acts of the executive officers as a ground on which to build up a profit or advantage for themselves at the expense of the proprietary roads which were their cestuis que trustent.
Upon the whole case, it is our conclusion that the trust with respect to the terminal property continues substantially as it was established at the incorporation of the terminal company; that this company holds all its property and franchises  whether conveyed to it at the beginning or acquired since  in trust for the purpose of carrying out, in substance, the terms and spirit of the contract of January 2, 1882, with such minor changes as have been agreed upon since, and is bound to exercise all its powers (including its power to renew the corporate charter) in furtherance of the trust; that the amendments of April 8, 1890, were unauthorized by the proprietary companies and had no effect in discharging or modifying the trust; that complainants are the sole beneficial owners of the property and franchises of the terminal company, and they and their successors and assigns, and such other *223 railroad companies owning or operating lines of railroad extending to or near to Des Moines as may be admitted to a proprietary interest by consent of complainants and their successors and assigns, are (as between the present parties and their successors) entitled to the sole beneficial use of the terminal property upon paying the cost of the terminal service, including interest upon the mortgage debt and other proper charges, after crediting all revenues derived from other sources, and without profit to the terminal company; and that from and after the expiration of the 1889 agreement complainants were and are entitled to have a similar working arrangement renewed from time to time perpetually: its specific terms to be agreed upon between themselves, or judicially ascertained if they are unable to agree.
Complainants are entitled to a decree establishing the trust, with all appropriate incidental relief. We do not attempt to lay down the particular provisions of the decree. These may be settled by the District Court upon the going down of the mandate.
To consider, next, the status of the Hubbell stock: The title acquired by them from the consolidated company is attacked by the Chicago, Milwaukee & St. Paul on the ground that it was acquired by inequitable means, the Hubbells being at the time in control of the board of directors. It is attacked by the Wabash on the ground that the consolidated company could not in equity pass the stock to the Hubbells and thus impair the interest in the terminal company then held by the St. Louis Company, to which the Wabash has succeeded. We have not found it necessary to consider whether these contentions ought to be sustained as independent grounds of substantive relief, or to what extent they would be affected by the agreement of July 31, 1897, in which the consolidated and the Wabash companies apparently gave recognition to the ownership of the stock by the Hubbells.
We pass this, because convinced that as incidental to the *224 principal relief granted, and necessary to give full effect to it, complainants are entitled upon equitable terms to have the Hubbell shares (including all "qualifying shares" controlled by them) surrendered for cancellation. Our reasons, briefly, are as follows: The issuance of the stock to the Messrs. Hubbell, and the clause of the 1897 agreement relating to it, already have been considered with other evidence cited by defendants to show an assent to or acquiescence in a modification or abandonment of the trust, and are found insufficient for the purpose. Hence this stock, being like all other stock of the terminal company subordinate to the trust that dominates all its property and franchises, does not represent in the hands of the Hubbells any property interest that they are entitled to set up as against the proprietary companies. When they acquired it, and at all other times material, they themselves were and still are acting in a fiduciary relation to the trust; hence they cannot be heard to assert any right in the stock that is inconsistent with the trust. Manifestly it would be inequitable for them to sell it to a bona fide purchaser who might claim (even though unsuccessfully) to hold it exempt from the trust. They may have expected to sell it at a profit to one of the proprietary companies, or with their consent to an outside company or companies qualified to participate in the beneficial use of the terminal property under the trust. But, because of their fiduciary character, they are debarred in equity from trafficking in the trust property in this or any other way, without the express consent of the beneficiaries; they would be bound to account for any profit that might accrue; and any seeming consent on the part of the beneficiaries to waive such profit in advance, not amounting to a termination of the fiduciary relation, is in its nature revocable. The Hubbell stock, therefore, representing no legitimate proprietary interest as against complainants, serves merely to evidence a voting power and to qualify its holders to act as directors *225 and officers of the terminal company: in short, to participate in a fiduciary employment, without profit beyond compensation for the value of the services rendered. But complainants, being the sole present beneficiaries of the trust and equitable owners of the terminal property, are entitled in equity to a controlling voice in the choice of directors, and especially to have the management of the trustee company, now and hereafter, freed from the domination of a stock interest that represents no property interest in the concerns of the trust. To guard against such alien control and at the same time prevent the danger of the Hubbell stock getting into the hands of bona fide holders who might set up rights under it which the present holders are debarred in equity from asserting  in short, to avoid undue jeopardy to the trust  complainants are entitled to have this stock surrendered, retired and canceled, and, until surrendered, to an injunction against any sale, assignment, or transfer of it or any part of it, and against the exercise of any voting power thereon; but upon terms that complainants shall repay to the Messrs. Hubbell the amount they paid to the consolidated Northern and Western Company for it, viz., $25,000, with interest thereon from January 29, 1894. How this should be apportioned, as between complainants, has not been discussed. It may be settled by the District Court.
The issue as to the surplus earnings relates to a considerable accumulation of moneys received by the terminal company from sources outside the proprietary companies. Possibly it may have become a moot question, in view of the result we have reached upon the main matter; but as this is not altogether clear we will dispose of the issue as raised. The agreement of 1889 provided that in making up the net cost of maintenance and operation chargeable to the proprietary lines on a wheelage basis, there should be deducted "the amount if any which other railway companies may be under obligation to pay by virtue of contracts *226 for the use of said property or parts thereof." In the course of time, the terminal company received not only payments from outside railroad companies under contracts technically for participation in the use of the terminal property  which have been credited to complainants and their predecessors according to their wheelage  but, in addition, substantial sums from railroad companies and others for switching and other terminal services and for rent of portions of the property and privileges thereon. Receipts of the latter character were called "surplus earnings." For a period of nearly two years after the making of the 1889 agreement they were included in the credits given to the proprietary companies. This was done at first by the accounting officers of the terminal company under the general direction of its president and executive committee. In February, 1891, the practice was approved by action of the board of directors. About a year later the board resolved that until its further action sums received as rents of real estate and all switching charges should not be thus credited, but should be used as a cash capital "with which to purchase supplies and pay current bills which come in before it receives its monthly revenue from the tenant companies." Thereafter the surplus revenues were not again credited to the proprietary companies.
We concur in the opinion of the Circuit Court of Appeals that by the fair construction of the 1889 agreement and the practical construction placed upon it by the parties at the beginning  a construction entirely consonant with the terms of the trust  complainants and their predecessors were entitled to credit for the surplus earnings as they accrued, each company to a share proportioned to its wheelage; and that the 1897 contract did not change this. It was decreed that these earnings belonged to complainants, and that there should be an accounting to ascertain the part due to each upon a wheelage basis. As to this the only question that occurs to us is whether the accounting *227 should include sums that have been appropriated out of these earnings and devoted to capital expenditures for acquiring additional property and for permanent improvements  sometimes, apparently, with approval of complainants or their predecessors, sometimes without. This would hardly seem to be of serious consequence in view of the result we have reached upon the main issue. It is chiefly of interest to complainants; but they have not argued the question, declaring indeed that the entire controversy as to the surplus earnings would be material only should this court decide that complainants had no proprietary interest in the terminal company. Defendants have assigned error to so much of the decree of the Circuit Court of Appeals as awards the surplus earnings to complainants, but have not furnished data enabling us to draw an accurate line between those that were and those that were not disbursed for permanent improvements, or between those disbursements that were approved and those that were not. Unaided by counsel we hardly could be expected to unravel the somewhat obscure evidence bearing upon these points. We must therefore content ourselves with simply affirming that portion of the decree which relates to the surplus profits.
The main portion of the decree as attacked by complainants must be reversed, and the cause remanded to the District Court for further proceedings in conformity with this opinion.
As to costs, the decrees of the courts below apportioned them one-half to complainants and one-half to the terminal company. We leave this disposition undisturbed. The entire costs in this court should be paid by defendants Frederick M. Hubbell and Frederick C. Hubbell.
No. 66. Decree reversed.
No. 67. Decree affirmed.
Cause remanded to the District Court for further proceedings in conformity with this opinion.