MT. PLYMOUTH CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 42409.   Promulgated April 20, 1932.

*George B. Carter, Esq.*, for the petitioner.

*Eugene Harpole, Esq.*, for the respondent.

OPINION.

STERNHAGEN: The petitioner, admitting that in the years in question it sold 1,398 lots for an amount which does not appear in evidence, omitted from the gross income shown on its income-tax returns

for the years in question $139,800 of the amount so received. The respondent treated this amount as part of petitioner's income for the years in question, and thus determined the present deficiency. The original petition alleged that this amount was a " reserve for golf course maintenance " and in an amendment to the petition filed at the hearing this designation is omitted and it is alleged that " the petitioner recognized the existence of a trust liability for maintaining golf courses and clubs for members given privileges and set aside out of each lot sale $100." The present theory of the petitioner's claim is that the aggregate sum of $100 per lot is excluded from its gross income because it constitutes a trust fund, of which the petitioner is trustee, analagous to that of the *Portland Cremation Association* in 31 Fed. (2d) 843.

The evidence, in our opinion, does not establish a trust or anything less than full ownership by the petitioner of the entire amount received in the sale of each lot. Although it has been said that it needs no prescribed form of words to express a trust, *Chicago Railway* v. *Des Moines Railway*, 254 U. S. 196, it does not follow that circumstances wholly lacking in the manisfestation of a trust intent, either in words or conduct, and wanting likewise in any practical demonstration that a trust has been in operation, should be characterized by this Board as a trust for the purpose of releasing from tax such receipts as are otherwise plain business income. A trust is taxable as such by section 219, Revenue Act of 1926, and the fiduciary is required by section 225 to file a return. It is not suggested here that this petitioner is subject to these provisions, and from the present record clearly it was not.

The most that can be said from the evidence is that the petitioner was obligated by its contract to accord to lot owners the privileges of the golf course and the clubhouse, but this falls far short of saying that the petitioner was trustee in respect of any fund or other property in its possession, even if its refusal to provide such privileges might give rise to the equitable remedy of specific performance. There is nothing here to justify a decree of the existence of a trust or requiring its enforcement. For all that appears the petitioner rightfully might and did use the entire amount indifferently as its own without accountability to anyone. Even if the evidence established that a definite reserve had been set up by the petitioner for the maintenance of the golf facilities, such a reserve could not *qua* reserve be either excluded from gross income, *Consolidated Asphalt Co.*, 1 B. T. A. 79; *Uvalde Co.*, 1 B. T. A. 932, or deducted therefrom to arrive at taxable net income, *William J. Ostheimer*, 1 B. T. A. 18.

The petitioner introduced in evidence a newspaper advertisement purporting to prove that it had publicly undertaken in 1926 to estab-

lish a trust fund. Despite the oral testimony as to its publication in 1926 there is irrefutable evidence on the exhibit itself to the contrary, for the petitioner's advertisement itself contains a statement of oranges shipped throughout 1926 and, on the reverse side of the exhibit, is a statement of copyright in 1927. The exhibit is entitled to no weight.

The petitioner is, as the respondent admits, entitled to deduct its actual maintenance expenses paid or accrued, and these have, we must assume in the absence of complaint on that score, been deducted in the Commissioner's audit and determination.

The cemetery cases to which the petitioner has referred, all, in our opinion, contained evidence of an undertaking far more specific, definite and binding, and, therefore, more susceptible of being construed as a trust than the circumstances at bar. The respondent's determination is sustained.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

---

TRAMMELL, dissenting: The precise question for determination in this case is whether or not a trust relationship existed between the petitioner and the lot owners in respect of the " special fund " set aside for maintenance of the golf course and clubhouse. The correct answer to this question is not dependent solely upon the statements contained in the contract of purchase and sale or other written instrument, nor the covenants contained in the deed. A valid trust may be created by parol in respect of personal property, such as we are dealing with here. *Metairie Cemetery Association*, 4 B. T. A. 903. And such a trust may be created without particular words of trust. It may be inferred from the surrounding facts and circumstances. In *Portland Cremation Association* v. *Commissioner*, 31 Fed. (2d) 843, the court said:

It is true that a mere honorary obligation which one may perform or not at his will does not create a trust. But a trust may be created by parol, and its creation does not depend on the use of particular words of trust. *Chicago, etc., Ry Co.* v. *Des Moines, etc. Ry. Co.*, 254 U. S. 196, 208, 41 S. Ct. 81, 65 L. Ed. 219. It may be inferred from facts and circumstances * * * and any words which indicate with sufficient certainty a purpose to create a trust will be effective in so doing. [Citing authorities.]

In the *Chicago, etc. Ry. Co.* case, above cited, the Supreme Court in its opinion said:

It needs no particular form of words to create a trust, so there be reasonable certainty as to the property, the objects, and the beneficiaries.

See also *Colton* v. *Colton*, 127 U. S. 300; *Holden* v. *Circleville Light & Power Co.*, 216 Fed. 490; *Helfenstein's Estate*, 77 Pa. St.

328; *In re Smith's Estate*, 144 Pa. St. 428; 22 Atl. 916; *Hibbard, Spencer, Bartlett & Co.*, 5 B. T. A. 464, 472.

The principles of law applicable to parol trust being clearly established by abundant authority, it is only necessary to examine the evidence in the instant case to see whether the facts established bring it within those principles.

The evidence here shows that the officers of the petitioner corporation, prior to the sale of any lots, conceived the plan of including in the sales price of each lot the sum of $100, which, upon the sale of the lot, was to be set aside as a " special fund " for the maintenance of the golf course over the period of 21 years. This plan was approved and adopted by the board of directors, and the salesmen were instructed to inform all prospective purchasers that said sum would be so set aside for such purpose from the sale of each lot. Such representations were thereafter in fact made to the prospective purchasers by the salesmen and also by the executive officers of the corporation, and in many cases were the moving cause which induced the prospects to become purchasers of lots. And said " special fund " was thereafter in fact created by the setting aside of $100 from the sales price of each lot as and when sold. In my opinion, this is only a fair inference or conclusion to be drawn from the evidence.

Louis C. Block, a witness for the petitioner, testified that he lived at Elkins Park, Philadelphia, and spent his winters in Florida. He purchased two lots at Mt. Plymouth. He testified further:

Q. What representations were made to you in regard to the golf course or golf club at the time that you were negotiating the purchase of these lots?

\*       \*       \*       \*       \*       \*       \*

A. Why, we were not interested particularly in buying more lots in Florida, but the proposition was that by joining this organization we would have the privilege of playing golf there and a proportion of the money paid for the lots would be applied to the maintenance of the golf course, and \* \* \* I would not have been interested, but they assured us that $100 from the purchase price of each lot would be put into a fund for the maintenance of the course. \* \* \*

Q. Would you have bought a lot if it had not been for that assurance?
A. Most assuredly not.

J. C. Otey, a witness for the petitioner, after stating that he was connected with the corporation as a salesman, testified:

Q. What instructions, if any, were given to you in regard to representations to make to prospective lot purchasers of Mt. Plymouth lots pertaining to the golf privileges?
A. With each lot went a membership for twenty-one years, that they would take out one hundred dollars of each sale, and use this as a trust fund for maintenance of the golf course.

E. F. Shriver, who was connected with the petitioner as a salesman and closer, testified:

Q. What instructions were given to you and have been given to you since you became connected with it (petitioner) in regard to representations to make to prospective lot purchasers as to the golf privileges and rights?

\* \* \* \* \* \* \*

A. I became interested in the proposition on resigning from the company I was with for the reason you could buy membership in Mt. Plymouth good for twenty-one years, or, good until 1947, on the purchase of a lot without dues, or assessments of any kind. There was $100 set aside, put in trust for the maintenance with each lot to hold until 1947 when that money would come back to Mt. Plymouth if there was any left.

Much additional testimony was offered to the same general effect, which it is unnecessary to quote at length here. This evidence, in my opinion, establishes a parol trust in respect to personal property. The facts bring it within the requirements stated by the Supreme Court in the *Chicago etc. Ry. Co.*, case, *supra*. The record, I think, establishes with reasonable certainty (1) the property, (2) the objects, and (3) the beneficiaries of the trust. The property, which was the subject matter of the trust, consisted of $100 set aside out of the purchase price of each lot sold; the object of the trust was the maintenance of the golf course out of said fund for the period of 21 years, or until 1947; and the beneficiaries were the lot owners.

The case at bar is clearly distinguishable from those cases in which the taxpayer merely set up a reserve fund as a protection against contractual liability. In such a case the taxpayer might diminish the fund by devoting it to other uses, or might abolish it entirely, for which acts it would not be answerable as for breach of a trust agreement, but its liability, if any, would be for breach of covenant or contract. See *Springdale Cemetery Association*, 3 B. T. A. 223; *Spring Canyon Coal Co.*, 13 B. T. A. 189; affd., 43 Fed. (2d) 78; certiorari denied, 284 U. S. 654.

In the case last cited, the Industrial Commission of Utah under the workmen's compensation law of that state, required the petitioner, a coal mining company which elected to become a " self-insurer," to set aside an amount of money equal to that which would be required as premiums if the employer were insured under the state insurance fund, such amount to be used for payment of compensation for medical and other benefits under the act. We held that the amounts so reserved by the petitioner were not deductible in computing net taxable income, and in affirming our decision the Circuit Court of Appeals in effect held that the fund in question was a reserve to cover contingent liability, not deductible from gross income. And in that connection, the court distinguished the case on the facts from *Portland Cremation Association* v. *Commissioner*, *supra*.

In the latter case, the cremation association set aside a percentage of the selling price of its niches and vaults to be used as a permanent maintenance fund, and in making sales, represented to prospective purchasers that perpetual maintenance was guaranteed by such fund. The court held that the amount so set aside constituted a trust fund which the association was entitled to exclude from gross income, saying:

In the case at bar, the representations went no further than to say that a portion of the purchase price would be placed in a maintenance fund. * * * While the petitioner here may be said to have had control of the money which it placed in the maintenance fund, diversion of that fund for corporation purposes or any purpose other than that designated by its promise to maintain the same, and the specific resolution of its board of directors to devote to that purpose 20 per centum of its receipts from sales, might be enjoined by a suit in equity as a violation of the trust agreement. The crucial question is, Did the petitioner's patrons possess the right to protect themselves and demand the preservation of the fund which the petitioner had covenanted with them to maintain and by its resolution had set apart for maintenance? That question is by the authorities answered in the affirmative.

On the facts, and the principles of law applicable thereto, the instant case is not, in my opinion, distinguishable from *Portland Cremation Association, supra.* If this petitioner had unconditionally represented to prospective purchasers that it would maintain the golf course for 21 years at its own expense and without cost to the lot owners, and then, in order to protect itself against its contingent liability in that regard, had set up a reserve fund of $100 from the sale of each lot, it could at any time have devoted such fund, or any portion thereof, to other corporate purposes, or it could have abolished the fund at any time, and unless and until the corporation breached its contract by failing to maintain the golf course in accordance with its agreement, the lot owners could not have complained. Such a reserve fund would have represented merely a segregated portion of the corporation's profits or surplus. And if such reserve had been insufficient to maintain the golf course for the designated period, the petitioner would have been obliged to use additional funds for that purpose or have been liable to respond in damages for breach of its agreement.

However, the petitioner made no such agreements or representations. It represented to prospective purchasers only that it would establish a maintenance fund of $100 from the sale of each lot and would administer that fund for the purpose stated. If the fund so set aside is properly and fairly administered, and nevertheless proves insufficient to maintain the golf course for the 21 years or until 1947, the petitioner will be under no contractual or other legal obligation to maintain the golf course out of its own funds. On the expendi-

ture of the special fund consisting of $100 from the sale of each lot, its obligation in that respect will have been fulfilled. On the other hand, the petitioner can not devote said fund to any other use, and at the instance of a property owner, a court of equity would undoubtedly enjoin the petitioner from so doing.

These considerations lead me to the conclusion that the fund in question constitutes a trust fund in the hands of the petitioner, and that it is entitled to exclude from gross income for the taxable year the amounts added to such fund in said year.