DES MOINES TERMINAL CO. v. DES MOINES UNION RY. CO. et al. (CHICAGO GREAT WESTERN R. CO. et al., Interveners).

No. 4332.

District Court, S. D. Iowa, Central Division.

Aug. 26, 1929.

Parrish, Cohen, Guthrie & Watters and Gamble, Read & Howland, all of Des Moines, Iowa, for plaintiff.

Hughes, O'Brien & Faville, of Des Moines, Iowa, for defendants.

W. D. Eaton and J. C. Pryor, both of Burlington, Iowa, for intervener Chicago, B. & Q. Ry. Co.

Carr, Cox, Evans & Riley, of Des Moines, Iowa, for intervener Chicago, Great Western Ry. Co.

DEWEY, District Judge.

This action involves the rights and interests of the Des Moines Union Railway Company. A suit also involving the affairs of this company was instituted in this district in the year 1907, and some phase of its interests has been before the federal court since that time.

The Des Moines Union Railway Company, hereinafter referred to as the Des Moines Union, was instituted in the year 1882, having for its purpose the organization, maintenance, and operation of a terminal company in the city of Des Moines. It was organized by several interested railroads, which during the course of the years have transferred their interests in the company, and all of such holding rights are now owned by the Chicago, Milwaukee, St. Paul & Pacific Railroad Company and the Wabash Railway Company, hereinafter referred to as the proprietary roads.

The purposes of the Des Moines Union are set out in a contract of date January 2, 1882, and afterwards incorporated in the articles of incorporation, paragraph 8 of which reads as follows: "It is understood and agreed that spur tracks shall be built connecting the said terminal grounds with such manufactories and other sources of trade in and about the city of Des Moines as offer sufficient opportunity for profit by so doing * * * provided that in case either of said companies (referring to the organizing companies) shall deem the construction of any of said tracks as not advantageous to its business, the question of constructing said track and which of the parties shall pay therefor shall be determined by arbitration."

And the articles of incorporation recite: "The general nature of the business to be transacted shall be the construction, ownership and operation of a railway in, around and about the city of Des Moines, including the construction, ownership and use of depots, freight houses, railway shops and repair shops, stockyards and whatever else may be useful and convenient for the operation of railroads at the terminal point of Des Moines, Iowa, as well as the transfer of cars from the line or depot of one railway to another, or from the various manufactories, warehouses, storehouses or elevators to each other or to any of the railways or depots thereof now constructed or to be constructed in or around said city of Des Moines."

In the year 1890 the articles of incorporation were amended, but without material change in the purposes of the Des Moines Union.

Mr. F. M. Hubbell was one of the early promoters of the company, and at least as early as 1888 became a director and the secretary, remaining as such until the year 1921. Mr. F. C. Hubbell, the son, was a director of the Des Moines Union since 1890, and president since 1892; and, during all of the period from 1888 to 1921, the Hubbell interests were in complete charge and control of the management and operation of the Des Moines Union.

The Des Moines Union became an operative company about the year 1884, and, having acquired by purchase sufficient real estate for its yards and tracks, operated as a railway terminal company. It owned extensive trackage extending practically from the east to the west boundary lines of the city of Des Moines, and owned and maintained warehouses, roundhouses, engines, and cars, and a large union station in the heart of the city.

Prior to 1890 the Des Moines Union had no tracks extending to any great distance south of its main east and west line tracks through Des Moines.

In 1888 F. M. Hubbell had acquired a large area of land lying south of the Des Moines Union tracks to the Raccoon river, and which is referred to in the evidence as the "factory district." This tract was low land, subject to overflow from the Raccoon river, but if protected from overflow an ideal location for factories, distributing houses, and business that required large yardage; close to transportation facilities and within reasonable distance of the business district of the city.

In 1890 the Des Moines Union acquired a strip of land known in the record as the "One Hundred Foot Strip," purchased from F. M. Hubbell, extending from the tracks of the Des Moines Union south to the Raccoon river and on the west edge of the factory dis-

trict. Part of the consideration for the sale of this strip to the Des Moines Union by Mr. Hubbell was an agreement on the part of the Des Moines Union to build a dike west of the strip to protect the factory district area on the east from the high waters of the Raccoon river. This dike was constructed by the Des Moines Union.

In 1895 the Des Moines Union also acquired for a nominal sum a right of way on a 13-foot strip from F. M. Hubbell known as track No. 87. This track extended in a curve from the 100-foot strip three or four blocks out into the factory district, and was a main line or lead track. And this strip or track later connected with another strip acquired from F. M. Hubbell 13 feet wide, lying east and parallel with West Ninth street and extending north and south and parallel with the 100-foot strip, and was 2,000 feet in length. This tract is known in the record as the "2,-000 foot strip."

Later the Des Moines Union built a track still farther west in the factory district on ground leased from F. M. Hubbell. This track also extended north and south and was known as track No. 103. The Des Moines Union also owned the right of way and track No. 88(a) and No. 88(b) thereon, and that portion of track No. 108 located south of the north line of Tuttle street in the factory district.

In the year 1890, then, the Des Moines Union had extended into the factory district from its 100-foot strip by main line and lead tracks to a distance that would permit it to cover at least the west half of the factory district with spur tracks.

Some time prior to the year 1890, F. M. Hubbell and the interests he represented, began acquiring certain spur tracks connected with the Des Moines Union, and began charging the Des Moines Union $1 per loaded car for any movement of cars by the Des Moines Union upon the tracks which it had thus acquired. Such tracks were paid for by F. M. Hubbell and built on land owned by him.

In the year 1902 and 1903 on account of the high water from the Raccoon river overflowing the factory district from the south, Mr. Hubbell conceived the idea of building the dike on the south edge of his factory district and land, along the bank of the Raccoon river. The Des Moines Union furnished the superintendent, the labor, and most of the material. A dike was built and a track laid thereon. This track, known in the record as

the "dike track" extended as far east as Seventh street which was about as far east in the factory district as the tracks of the Des Moines Union, but the Des Moines Union Tracks were farther north.

On the completion of the dike and the track laid thereon, a bill was rendered to Mr. Hubbell for the cost and expense of building the dike and laying the track and paid by him.

The laying of this track, however, required a crossing of the Chicago, Burlington & Quincy Railway Company right of way and tracks, and a right to cross the same was obtained in the name of the Des Moines Union Company, and is still held in its name.

At about this time Mr. F. M. Hubbell and associates decided to incorporate a terminal company for the purpose of managing and controlling the Hubbell interests in the development of a system of tracks in the factory district joining the Des Moines Union main line or lead tracks and owned by them, and taking care of the Hubbell interests in this respect. This company was incorporated as a terminal company under the name of the Des Moines Terminal Company.

In considering this case, then, we have to take into account the fact that F. M. Hubbell and the firm of F. M. Hubbell & Son, and the Hubbell trust estate and the Des Moines Terminal Company represented the same interests and the same parties in interest.

After the incorporation of the Des Moines Terminal Company the dike track was transferred to the Des Moines Terminal Company, and was afterwards operated as a Des Moines Terminal main track, although at first it was only used for storage of cars and to connect with a spur track leading to a gravel bed which was being developed by the Des Moines Terminal Company.

From and after the year 1898, or at least after the incorporation of the Des Moines Terminal Company in May, 1902, all the tracks that were extended into the factory district were either constructed by the Des Moines Terminal Company, built by the Des Moines Union and purchased by the Des Moines Terminal, or built by the Des Moines Union on land owned by the Des Moines Terminal Company under authority of leases the terms of which have expired and which subject the tracks so built by the Des Moines Union on leased premises of the Des Moines Terminal to be removed at the option and will of such terminal company.

The main-line track of the system of trackage built up by the Des Moines Terminal Company was the dike track which was continued east to the Des Moines river, and by lead tracks extending north from the dike track practically every block, made to cover the entire factory district.

The Des Moines Union owned tracks on the east side of the Des Moines river, and here, also, all extensions of its tracks made after 1902 were built by the Des Moines Terminal Company and maintained by it as its property.

In the construction of the Des Moines Terminal Company tracks after the year 1905 its lead tracks, extending north from the main-line dike track, paralleled, interfered, and commingled with the tracks of the Des Moines Union on its right of way, or were taken over by the Des Moines Terminal Company after leases had expired.

Up to 1905 the tracks owned by the Hubbell interests, and later by the Des Moines Terminal Company, were all constructed and maintained by the track department and employees of the Des Moines Union. In the year 1905, however, the Des Moines Terminal Company employed its own superintendent and maintenance crews, and from and after that time the tracks were constructed and maintained by its own superintendent and employees.

The suit here brought is by the Des Moines Terminal Company, which has the legal title to all of the land upon which tracks are laid in the factory district, other than those referred to as being owned by the Des Moines Union, to quiet title to such lands and all the tracks thereon.

And this is met by the proprietary roads with the claim that in the construction of said system of tracks by the Hubbell interests and the Des Moines Terminal Company, the same being constructed while the Hubbell interests were acting as trustee for the Des Moines Union, that all of this immense system of trackage is impressed with a trust; that the same was constructed as a part of one system belonging to the Des Moines Union and is a part thereof; that the construction and operation thereof constituted a breach of trust by the Hubbell interests and the Des Moines Terminal Company; and that, not only does the Des Moines Union have a proprietary right and equitable interest in such tracks and all of the same, but that the proprietary roads are entitled to an accounting and the impression of a trust on

all of the earnings of the Des Moines Terminal Company during the period that it has collected such fees from the Des Moines Union for the use of the Hubbell and Des Moines Terminal Company tracks.

The facts are intricate and the evidence voluminous; more than eight weeks being consumed in the taking of the testimony, alone, and the arguments to this court extending through a period of a full week.

As all of these transactions complained of occurred at a time when F. M. Hubbell and the Hubbell interests controlled and dominated the board of directors and management and control of the Des Moines Union, and as all dealings had in the extensions of these tracks were between the Des Moines Union and the Hubbell interests, it is necessary to first determine the relationship of the parties in their dealings and transactions, to determine the rights of the parties and interests involved. This, however, has been done by the Supreme Court of the United States, so that this court is relieved from the burden of making this decision.

In a suit involving the question of the relationship of Mr. F. M. Hubbell and the Hubbell interests with the proprietary roads, the Supreme Court, in the case of the C., M. & St. P. Ry. Co. and the Wabash Ry. Co. v. Des Moines Union Ry. Co. et al., 254 U. S. 196, 41 S. Ct. 81, 85, 65 L. Ed. 220, said: "Upon a review of all the evidence * * * we are clear that the effect of the transactions * * * was to establish a trust in the full and proper sense of the word, the terminal company [Des Moines Union] being invested as trustee with complete legal title, but without beneficial ownership, and subject to a duty to maintain and operate the property and exercise all of its corporate powers for the common use and benefit of the three railroad companies, their successors and assigns. * * * Obviously the fiduciary character of the terminal company [Des Moines Union] extended to its officers and directors as to all others concerned in its management, charging them with a duty to uphold the trust and imposing upon them the usual disability about reaping a personal advantage at the expense of the beneficiaries."

The Supreme Court held, therefore, without question, that, in the management of the Des Moines Union, the Messrs. Hubbell were managing a trust estate, the proprietary roads being the beneficiaries. The relation of the Messrs. Hubbell then in the manage-

ment of the Des Moines Union was that of a fiduciary.

In 2 Corpus Juris, 692 et seq., it is said that: The relation of an agent to his principal is ordinarily that of a fiduciary, and as such, it is his duty in all dealings covering or affecting the subject matter of his agency to act with the utmost good faith and loyalty for the furtherance and advancement of the interests of his principal. So sedulously is this principle guarded that all acts of an agent which tend to violate his fiduciary duty are regarded as frauds upon the confidence bestowed, and are not only invalid as to the principal but are also against public policy; but as the presumption in the absence of proof to the contrary is that an agent has performed his duty in good faith, the principal may rely upon the agent's faithfulness until he receives notice that he is not trustworthy. If the agent has openly and fairly dealt with the matters of the agency on terms fixed by the principal the transaction will be upheld, as is also the case where the principal with the full knowledge of all the facts fails to dissent, as he alone can take advantage of the rule; nor is the agent liable as for fraud where the principal has not been deceived by his acts and has suffered no injury therefrom. An agent must not represent interests adverse to his principal; he must not put himself into such a position that his interests become antagonistic to those of his principal. If he violates the rule, the principal when he acquires full knowledge of the facts may repudiate the transaction or adopt it and compel the agent to account for any profits made thereby.

In the case of Trice v. Comstock (C. C. A.) 121 F. 620, 623, 61 L. R. A. 176, Judge Sanborn, in defining the duties devolving from fiduciary relations, states the rule as follows: "From the agreement which underlies and conditions these fiduciary relations, the law both implies a contract and imposes a duty that the servant shall be faithful to his master, the attorney to his client, the agent to his principal, the trustee to his cestui que trust, that each shall work and act with an eye single to the interest of his correlate, and that no one of them shall use the interest or knowledge which he acquires through the relation so as to defeat or hinder the other party to it in accomplishing any of the purposes for which it was created. * * * The duty * * * of an agent to be faithful to his principal, does not cease when the employment ends, and it cannot be renounced at will by the termination of the relation. It is as sacred and inviolable after as before the expiration of its term."

And at page 624, in the same case: "The law imposed upon this agent, Comstock, the duty to use all the knowledge and all the benefits he derived from his agency to accomplish the purpose of his principals, and it implied an agreement upon his part that he would faithfully discharge this duty. It forbade him to use them for his sole benefit or to prevent his principals from obtaining the object of the agency, and charged everything which he acquired by a violation of this inhibition with a constructive trust for their benefit."

In fact the duties of the Messrs. Hubbell in their management of the Des Moines Union, and in their relationship to the proprietary companies, are covered by the decision of the Supreme Court, supra, when it is said that they had a duty to maintain and operate the property for the common use and benefit of the proprietary railroad companies; and that case, and the facts therein contained, are referred to as establishing a trust relationship that existed between the Messrs. Hubbell and the proprietary roads.

Based upon these rules of law there can be but one answer to the question whether or not the Messrs. Hubbell violated their trust in the building, owning, and extending a system of tracks connected and joined directly or indirectly with the Des Moines Union system for their own benefit and profit; and in failing to extend the Des Moines Union for the purposes for which it was organized; and in constructing their own system as to bottle up, hinder, and deny to the Des Moines Union power to extend farther their tracks into the factory district.

In fact some of the acts of the Des Moines Terminal Company in extending spur tracks to a manufacturing plant or establishment, with their own funds, and charging the Des Moines Union for the use thereof, would hardly stand the scrutiny of a court of equity were the transactions had between private individuals.

The extension of the system of the Des Moines Union by the Des Moines Terminal of the tracks now claimed to be owned by the Des Moines Terminal Company falls into different classes: (1) Tracks constructed by the Des Moines Union on the right of way leased from the Messrs. Hubbell or the Des Moines Terminal Company. These aggregate some eleven or twelve tracks. (2) Tracks built by the Des Moines Union on

land owned by the Messrs. Hubbell and subsequently purchased by the Des Moines Terminal Company. Of these there were three or four. (3) Tracks constructed by the Des Moines Terminal Company on land owned by the Des Moines Terminal Company or the Hubbell estate, and aggregating some forty tracks.

Most of these tracks were constructed by the Des Moines Terminal under the direction of its own superintendent and by its own employees and paid for by the Des Moines Terminal Company. Some few were constructed by the Des Moines Union and after completion billed to and paid for by the Messrs. Hubbell or the Des Moines Terminal Company. And some were constructed in part by the Des Moines Union and in part by the Des Moines Terminal, but afterwards paid for by the Messrs. Hubbell or the Des Moines Terminal Company.

From the foregoing it is apparent that, nothing else appearing, there should be little question but that the Des Moines Union Company has certain rights in and to all of the trackage and right of way owned and operated by the Des Moines Terminal Company.

The equities, however, are not entirely on one side. It must be kept in mind that the management and control of the Des Moines Union by Mr. F. M. Hubbell was but an incident in connection with his activities in developing the city of Des Moines in which he had extensive interests. He was director of several railroads entering the city of Des Moines, at least during the formative period of the transportation development. He owned large tracts of real estate in all parts of the city. There are tracts of Hubbell real estate being developed in all parts of Des Moines.

In 1890, Mr. F. M. Hubbell purchased, for the consideration of $135,000, certain bonds and a one-fourth interest in the capital stock of the Des Moines Union. He already controlled three-eighths of the capital stock; and from and after that time until the final decision of the Supreme Court in 1920 Mr. Hubbell believed and acted upon the assumption that he was the owner of at least five-eighths of the proprietary interests in the Des Moines Union. These claims on his part were confirmed by the District Court, and again confirmed by the decision of the Circuit Court of Appeals of this Circuit reported in 254 F. 927, although there was a dissenting opinion by Judge Hook.

On April 8, 1890, at a meeting of the stockholders of the Des Moines Union, articles of incorporation of that company were amended so as to provide as follows:

"The Board of Directors shall have the power to authorize execution of mortgages, to issue bonds, to enter into contracts, to purchase property, to construct buildings, to make leases, to authorize the institution of condemnation proceedings and to do all such other things as may be proper or necessary for the corporation to do, but with respect to the matters above mentioned and all other matters except the ordinary operation of the property, the Board of Directors can act only upon the unanimous vote of the eight members thereof and in order to facilitate the transaction of business, power is expressly conferred upon each of the Directors to delegate by written authority some other person to act or vote in his stead.

"Provided' that such authority shall be filed with the Secretary at or before the time the meeting convenes.

"The Board of Directors shall annually select an executive committee, but such selection must be made by the vote of at least seven members. The duties and powers of such committee shall be defined in the By-laws."

As the proprietary roads were among the eight members, Mr. Hubbell representing five, and the proprietary roads the other three, it appears that, outside of the ordinary operation of the property of which the Messrs. Hubbell had exclusive control as against the proprietary companies, acts such as the extension of its property could only be had on the unanimous vote of the eight members of the board of directors, which meant the consent of the proprietary roads, if they cared to exercise that authority. The proprietary roads had the minor representation on the board of directors and must be charged with notice at least of matters discussed at Directors meetings.

The Hubbell interests were naturally concerned in procuring factories, manufacturing plants, etc., to locate in the factory district, and it was a part of their general plan in the development of the city of Des Moines to build up this district and furnish transportation. It was undoubtedly their general policy to control their own system of terminal tracks so as to be in a position to comply with requests and demands of parties owning or controlling factory sites for transportation.

And it must be admitted that the executive ability of the Messrs. Hubbell, their ef-

forts, and financial support combined to build up and make possible the "factory district." Had it not been for their ability, money, and power, it is a question whether the Des Moines Union would have succeeded, let alone reaching the extensive proportions that it attained under the Hubbell management.

It is hardly equitable to turn over to the proprietary roads all the results of years of successful effort, when their primary interest in the concern was only to have protection in their entrance to the city of Des Moines, and who for years consented to the control and management of the Des Moines Union by the Hubbell interests, or for them to now step in and ask that they be permitted to reap the entire benefit.

It must be remembered also that all tracks other than the tracks located on the 100-foot strip, track No. 87, the tracks located on the 2,000-foot strip, track 103, and that portion of track 108 located south of the north line of Tuttle street, and track No. 88 (a) and track No. 88 (b), the tracks in the factory district, were built on lands belonging to either the Des Moines Terminal Company, F. M. Hubbell Son & Co., or the trustees of the F. M. Hubbell estate, with very minor exceptions.

Also that the charges of $1 a car for the use of the Des Moines Terminal tracks, being substantially one-third of the total switching charge collected by the Des Moines Union, is not claimed to have been other than a reasonable charge as rental for the use of the tracks of the terminal company by the Des Moines Union.

However, the fact remains that under the law the proprietary companies have equitable interests by reason of the commingling of the Des Moines Terminal property with the Des Moines Union by trustees, unless laches, estoppel, abandonment, or other equitable reasons prevent the proprietary roads from enforcing their interests in the entire system, both as now owned by them and as owned and controlled at the present time by the Des Moines Terminal Company.

The court is satisfied that the proprietary roads had general knowledge of the activities of the Hubbell interests and of the Des Moines Terminal Company in extending and joining its tracks to the system of the Des Moines Union.

Beginning with the month of November, 1905, the Des Moines Terminal Company rendered bills against the Chicago, Milwaukee & St. Paul Railroad Company for switching or trackage involving movement of cars over Des Moines Terminal Company tracks. And beginning with the month of November, 1905, and for every month subsequent thereto, except December, 1905, the Des Moines Terminal Company received payment for switching or trackage charges against the Wabash Railway Company.

As early as 1905 the controversy arose over the expenditure of the funds of the Des Moines Union, and discussions were had as to track extension by the proprietary roads and the officials of the Des Moines Union, which finally culminated in the suit equity No. 4001.

The Des Moines Terminal Company was incorporated and the papers filed for record May 29, 1902.

It is hardly to be conceived that the beneficiaries of the trust, the proprietary roads above referred to, being actually engaged in the railroad business and having large interests in, and a representative on the board of directors of the Des Moines Union, were not conversant with the facts, at least as early as the year 1900, that the Hubbell interests were acquiring tracks joined to the Des Moines Union tracks and charging for their use. And that from and after the year 1902 that they had organized a corporation for that purpose and were continuing the expansion and extension of the tracks in the factory district for the benefit of the Hubbell estate.

The building of tracks cannot be done in secret, and the officers of the proprietary roads without question knew what was going on. The Des Moines Terminal Company rendered bills each month after the year 1905, which were paid by the Des Moines Union; and the proprietary roads had one of their officers go over the accounts and records of the Des Moines Union monthly.

Tariffs were filed with the Interstate Commerce Commission and the board of railroad Commissioners, as early as 1906, by the Des Moines Union, concurred in by the Des Moines Terminal Company. These tariffs show the location of industries on the Des Moines Terminal, that is, which industries were located on the Des Moines Terminal and which on the Des Moines Union. These tariffs were published by the Des Moines Union with the name of the Des Moines Terminal in smaller letters on the face of the pamphlet showing the rates and charges.

However, it must be remembered that for some time prior to the year 1907, the propri-

etary roads were dissatisfied with the use of the earnings of the company by the Messrs. Hubbell, and, after repeated protests, the suit Equity No. 4001 was instituted on February 5, 1907. Also, that by an amendment to the complaint, filed May 12, 1909, there was a claim set up, referred to as paragraph 37 and 38, that certain spur tracks owned and being maintained by the Des Moines Terminal were the equitable property of the Des Moines Union.

Questions of notice then, after May 12, 1909, are of little importance, because the claims of the parties were in general set forth in a court proceeding and were known to all parties in interest.

It is claimed that, with this knowledge, the evidence shows a waiver and abandonment by the proprietary roads of their claims in and to any ownership of the property of the Des Moines Terminal Company, or at least that their laches prevents equitable relief.

In one of the arguments of the attorneys for the Wabash Railway Company to the Supreme Court of the United States, it was represented that "the Hubbells owned the Des Moines Terminal Company and the Des Moines Western Terminal Company which also owns terminal properties in Des Moines, and the Hubbells operated them for their own profit in connection with the operation of the Des Moines Union."

However, this claimed admission of a fact by the attorneys in their argument could hardly be considered as an admission of the proprietary roads in the light of the record showing a consistent claim by them in the assignments of error that the court erred in not decreeing the proprietary roads to have an equitable interest in the Des Moines Terminal Company system.

Other acts and conduct of the proprietary roads, however, are not so easy of explanation.

■ After the mandate from the Supreme Court of the United States was received, the parties in equity cause No. 4001 prepared and had filed in this court a decree which is recognized by the parties in this suit as a "consent decree." In that decree was a provision as follows: "The Court retains jurisdiction of this case for the purpose of making such further or other order or decree in the premises as the nature of the case shall require and as to the Court shall seem meet and proper." While the defendants and cross-petitioners in this suit claim that this

provision was a retention of jurisdiction to herein determine the matters growing out of the issues in the case at bar, the court is satisfied that this retention of jurisdiction was only as to making further orders in the premises, which must from its very wording refer to matters set out in the final decree. Bartlesville Zinc Co. v. Indian Ter. Ill. Oil Co. (D. C.) 14 F.(2d) 133.

After this decree was filed, the executives of the proprietary roads met with Mr. Hubbell in his office and endeavored to lease for a period of fifty years the tracks and right of way of the Des Moines Terminal Company. There were two or three of those meetings with Mr. Hubbell, and at no time, or in any manner, did the executives of the roads or their attorneys make any claim of a proprietary interest or equitable ownership of any of the property of the Des Moines Terminal Company.

■ It seems to me that, knowing of the claims in its petition and the findings and mandate of the Supreme Court, the failure of the officers of the proprietary roads and their experienced counsel to reserve and preserve in the decree a provision to the effect that all questions not disposed of by the decree are reserved for future adjudication, indicated an intention on the part of the Des Moines Union and the proprietary roads to voluntarily relinquish such claims, and the position afterwards taken by these same officials, when the tracks of the Terminal Company were sought to be leased, that the Terminal Company was the owner of all the tracks and real estate in controversy, confirms such indicated intention, and results in a waiver of the claim now asserted that in equity they are entitled to ownership of the Terminal property.

The Des Moines Union and the proprietary companies are not in a position now to claim that the laying of these tracks by the Des Moines Terminal Company upon Des Moines Terminal Company property, or the renting of the tracks laid on Des Moines Terminal Company property to the Des Moines Union, amounted to a dedication of such property to the Des Moines Union, or was so impressed with a trust as to amount to ownership thereof by the Des Moines Union.

■ However, there is nothing here inconsistent with or a waiver of their rights to enforce an implied agreement and understanding that in consideration of the Des Moines Terminal Company joining its tracks with, and using the facilities of the Des Moines

Union, the latter should have the exclusive use of these tracks upon reasonable terms.

One of the defenses of the Des Moines Terminal Company to the claim of the proprietary roads of a violation of trust duties is that the building of these spur tracks, main-line and lead tracks, and all matters growing out of the extension of the system, were done fairly, and that a full and open disclosure of all matters connected therewith was made to the proprietary roads; and that no undue advantage was taken of the proprietary roads by such acts on the part of the Des Moines Terminal officers.

In arguing these matters, the attorneys for the Des Moines Terminal Company continued to urge that the exclusive right by the Des Moines Union to use the tracks to the industries was a part consideration for the right to build the tracks by the Des Moines Terminal Company; and the plaintiff makes such exclusive use, upon reasonable terms, a basis for the argument that the transactions were fair and without undue benefit to the trustees of the Des Moines Union. Such arguments appear upon pages 120, 121, 125, and 137 of plaintiff's printed brief and argument. An argument at page 138 is that the building of the tracks was without undue advantage, and "that the interests of those individuals worked in unison for the welfare of the Des Moines Union Company, and therefore such transactions are valid and enforcible both at law and in equity."

And at page 139, reference is again had to the fact that the actions of the Des Moines Terminal worked to the benefit of the Des Moines Union. And on page 141 they speak of the distinct advantage to the Des Moines Union. And on page 142, again reference is made to the exclusive use of the tracks on reasonable terms.

These benefits, privileges, and exclusive use must have been intended as a consideration for the injury to the Des Moines Union resulting from the building and commingling of tracks that prevented further expansion of the Des Moines Union into the factory district.

■ We have seen that trust duties continue after the termination of the relationship, and it certainly was a violation of that duty when the Des Moines Terminal Company endeavored to sever this unified permanent system by leasing the property that was in its name to the intervening companies.

■ Courts of equity sometimes apply the doctrine of equitable estoppel to cases where the entry has been under a license, and where the conduct of the licensor has been such that it would be a fraud on the licensee to permit the licensor to deny that there was a contract for an interest in the land, and hence they treat the case as one of a parol contract partly performed, which the court will enforce. Minn. Mill Co. v. M. & St. L. Ry. Co., 51 Minn. 304, 53 N. W. 639, 641.

The implied parol contract and arrangement here was that the Des Moines Terminal Company should have the right to extend the system of tracks of the Des Moines Union in the factory district owned by the Hubbell interests, and in consideration of the right to the use of the facilities of the Des Moines Union, and to join and connect their tracks with the Des Moines Union system, that the Des Moines Union should have the exclusive use of such tracks on reasonable terms. This contract should be enforced and the relationship returned as far as may be to the status quo prior to the lease by the Des Moines Terminal Company to the intervening roads.

The final decree was filed April 5, 1921, and defendant companies at once tried to lease the Des Moines Terminal Company tracks. The first notice that the Des Moines Union had that a lease could not be obtained from the Des Moines Terminal Company was on or about June 3, 1921, when a lease was executed with the Chicago Great Western Railroad Company and the Chicago, Burlington & Quincy Railroad Company. Following this, and in March, 1922, a petition and motion was filed in equity No. 4001 wherein they asserted an equitable right in and to the Des Moines Terminal property, and constituting the identical claims that are made in the case at bar.

A finding of a waiver and abandonment by the proprietary roads of a right to claim the ownership of the Des Moines Terminal property is not inconsistent with their rights to have enforced the implied parol contract above referred to. And this disposes of any claims as against such equitable relief of waiver, laches, estoppel, or res adjudicata.

Certainly no consent, either express or implied, can be found from the evidence that the proprietary roads permitted this great system of railroads to be built up as a part and parcel of the Des Moines Union with the idea that it could at the will or pleasure of Mr. Hubbell be arbitrarily severed from the parent plant.

It seems to me that it resolves itself into a situation that all parties in interest recog-

nized and approved; that an extension of the tracks of the Des Moines Union might be had by Mr. Hubbell into his own factory district; and a general satisfaction with this general arrangement by all parties in interest, at least at the time of the filing of the decree in April, 1921; and this general recognition and consent to this arrangement continued until it was breached by the lease to the intervening railroads.

It was unfortunate indeed that the parties were unable to arrive at the equitable adjustment which must have been contemplated at the time the proprietary roads endeavored to lease the property of the Des Moines Terminal Company, but the incident points to a proper and equitable decision of the matters here involved.

The plaintiff, at page 131 of its printed argument, endeavors to answer the claim that the two systems are interwoven and unified, and that the public interests require that they should be decreed to be a part of the trust estate of the Des Moines Union, by a showing that the defendants have a remedy at law by subdivision 4 of section 405 of the Transportation Act of 1920 (49 USCA § 3(4).

The reading of this section, however, discloses that the procedure provided does not supplant a case such as the one at bar, which is from its very nature an equitable suit to be determined on equitable rules and principles.

Intervenors argue that they acquired their rights under a lease with the Des Moines Terminal Company without any knowledge of any rights or interests therein of the Des Moines Union. This claim the court is unable to accept. Any one looking at and considering the map of the district and tracks in controversy could see and should know that it comprised one interwoven and unified system. And in the light of the knowledge that intervenors had of the suit and determination thereof between these parties, they must have known that there were some interests which the Des Moines Union had, or claimed to have, in and to the system owned by the Des Moines Terminal.

The fact that the Des Moines Union was in actual possession and use of the property of the Des Moines Terminal Company at the time of the execution of the lease was also bound to put the intervening roads on inquiry and require them to use reasonable diligence to ascertain the rights of the parties. The Des Moines Terminal Company never owned a car, or roundhouse, or any equipment for the movement of cars on its tracks. It relied exclusively upon the plant of the Des Moines Union in this respect.

If there is any merit in charging the proprietary roads of the Des Moines Union with the knowledge of the acts of the Des Moines Terminal Company in extending the tracks of the Des Moines Union and claiming ownership thereof, the same reasoning must apply as against the intervening roads, resulting in the conclusion that they had knowledge of the entire situation and the rights and interests of the Des Moines Union in and to the property of the Des Moines Terminal Company.

The bona fides of the leases to the intervening companies is brought into question from the fact that there were tracks owned by the Des Moines Terminal Company connected with the Des Moines Union that no other railroad could reach without the use of the Des Moines Union tracks. These tracks were included in the lease under a provision that the lease is to cover such tracks as and when the Des Moines Terminal Company is able to connect such tracks with the remainder of the terminal system. It was known to both parties to that lease that such tracks never could come within the terms thereof.

Perhaps one other matter should be disposed of, in the light of certain motions which were submitted to the court for rulings in connection with its decision in the main case.

While holding that the case at bar is an independent suit in so far as not to be included within the terms of the retention of jurisdiction by the court in the final decree of April 5, 1921, it seems to me that this suit should be taken into consideration with the petition and motion filed by the defendants in equity cause No. 4001, and is so related to the main case as to be ancillary thereto, at least in so far as jurisdiction is concerned. The motions therefore of the plaintiff and interveners should be and the same are, overruled.

It is therefore the order and judgment of this court that all of the tracks of the Des Moines Terminal Company and the real estate used in connection therewith, and the real estate, if any, now under lease to the Des Moines Union, be impressed with a trust in favor of the Des Moines Union Railway Company for the exclusive possession and use thereof by the Des Moines Union Company upon reasonable terms.

616

By this finding the Des Moines Terminal Company is entitled to all the rents and profits heretofore received from the Des Moines Union, but the Des Moines Union is entitled to an accounting as against the intervening roads for any profits made by such intervening roads in the use of the property.

And this court will retain jurisdiction of all the parties in interest for the determination, if necessary, of such reasonable terms; and settlement with the intervening roads. The decree to provide for arbitration as to these matters as well as to other matters which may be necessary in the adjustment of the rights of the parties determined by this memorandum and the decree. The costs will be taxed in equal shares to the plaintiff and to each of the intervening defendants.

The attorneys for the defendants and cross-petitioners are requested to prepare and present a decree in conformity with the decision herein made, protecting the Des Moines Terminal Company in its rights to extend its tracks in accordance with the provisions of the contract of lease entered into between the intervening defendants and the Des Moines Terminal Company, and if the provisions therein are not satisfactory to the parties, providing arbitration thereof, similar to that provided by said lease agreement, protecting, however, the Chicago Great Western Railroad Company in its lease with the Des Moines Terminal Company of May 27, 1921, in so far as the same may not conflict with the rights of the Des Moines Union Railway Company to the use of the tracks of the Des Moines Terminal Company.

To all and each and every part of this memorandum of decision, each and all of the parties hereto duly except.