SEABOARD AIR LINE RAILROAD COMPANY v. ATLANTIC COAST LINE RAILROAD COMPANY AND WILMINGTON RAIILWAY BRIDGE COMPANY.

(Filed 9 July, 1954.)

**1. Railroads § 16; Injunctions §3—**

If a carrier has a contractual right to construct and use a turnout or junction from trackage used by it jointly with another carrier and owned by a separate corporation, and such turnout or junction is the only feasible way for it to serve industries located in the area, equity will grant injunctive relief to preserve such right as being necessary to afford an adequate and complete remedy.

**2. Appeal and Error § 40d—**

Facts admitted by the parties are conclusive.

**3. Same—**

Findings of fact by the trial court under agreement of the parties are conclusive when supported by competent evidence.

**4. Railroads § 16—**

Railroad companies formed a corporation to provide bridges and trackage for their joint use. At the first meeting of the board of directors of such corporation prior to the construction of the bridges and trackage, the directors passed a resolution stipulating that any alteration of the general route surveyed should not be made except with the consent of each of the railroad companies. *Held:* The resolution relates to the original construction or location of the bridges and trackage for joint use, and has no bearing upon the right of one of the incorporators to construct at a later date a breakout or junction from the joint facilities.

**5. Same—Railroad companies forming corporation to provide common trackage held entitled to equal use of such trackage.**

Three railroad companies formed a corporation to provide bridges and trackage for their joint use. One of the railroad companies provided one-half the capital stock with the right to appoint two directors, and each of the other companies provided one-fourth the capital stock with the right to appoint two directors each. Plaintiff railroad company succeeded to the rights of the incorporator furnishing one-half the capital stock, and defendant railroad company succeeded to the rights of the two other incorporators. The corporation thus created operated no trains, paid no dividends, and received no revenue. Its operation and maintenance cost were originally paid in proportion to the respective stockholdings, but later such costs were apportioned between plaintiff railroad company and defendant railroad company on a user or wheelage basis. Dealings between the parties over the course of years indicated that they contemplated equal rights in joint use of the facilities thus provided. *Held:* The right of each incorporator and its successor to the equal use of the joint facilities springs from the nature of the original incorporation, confirmed by usage and the course of dealings across the years, and such right may not be defeated by the control of one of them over the corporation created to furnish the joint facilities.

**6. Railroads § 14; Corporations § 17a—**

Railroad companies created a corporation for the purpose of providing bridges and trackage for their joint use. *Held:* The fact that such corporation has completed the bridges and trackage authorized by its charter does not render it *ultra vires* such corporation to grant to the successor of one of the incorporators authority to construct a breakout or junction from the common trackage, it being apparent that the jointly used trackage was not only for the benefit of the incorporators' lines as then constructed, but was for the development and expansion of their facilities and operations for future needs.

**7. Same—**

Railroads have authority under general statutes to provide turnouts, sidings, and switches to serve industrial plants along or near their main lines. G.S. 60-37 (7).

**8. Same—**

In the absence of express statutory or charter authorization, the power to construct a railroad includes authority to construct such spur, in-

dustrial, switching, and other auxiliary tracks as may be necessary to serve the public needs along or near the main line.

**9. Railroads § 16—**

The right of each of two railroads to equal use of common trackage does not mean identical use, and where one of them constructs a spur from its independent line to serve a certain area adjacent to such line, but the common trackage is used by it in its operation serving such spur, the other has the right to construct and use a spur from the common trackage when this is the sole feasible means it has to serve industries in the same area, provided such operations will not impair the use of the common trackage by the other.

**10. Carriers § 7—**

Railroads are *quasi*-public corporations which must operate under the public policy of the State to encourage competition among them for the public good and convenience, and one railroad company will not be allowed to preclude competition by another in a particular area by arbitrarily refusing such other reasonable use of its right of way and trackage. G.S. 60-37 ; G.S. 60-60.

**11. Arbitration and Award § 12—**

A provision in an agreement that dispute between the parties thereto as to the proper meaning and interpretation of the agreement should be referred to arbitrators upon the request of either of the parties, gives to each party the right but not the duty to invoke the arbitration provision, and when neither has done so the agreement to arbitrate will not preclude an action on the contract.

**12. Same—**

A supplemental agreement to a contract which provides for arbitration of a dispute between the parties as to the meaning and interpretation of the supplemental agreement will not preclude a party to the agreement from bringing action to settle a dispute as to matter embraced within the original contract but not the supplemental agreement.

**13. Corporations § 10—**

A corporation organized to construct and maintain common trackage for the incorporating railroads was under the control of one of the two railroads using such common facilities. Such corporation and the railroad having control thereof, through persons who acted for both, denied the other railroad company the right to construct a junction or turnout from the common trackage. *Held:* The law will not require a vain thing and, therefore, such other railroad company is not required to exhaust its rights as a stockholder before instituting action to establish its right to construct the turnout.

**14. Same—**

Where an incorporator's rights to use facilities held by the corporation for joint use of the incorporators depend upon the circumstances surrounding the incorporation, confirmed by usage and course of dealings between the parties over a period of years, and not upon its rights as a stockholder, *held*, such incorporator will not be required to exhaust its

remedies as a stockholder before instituting an action to establish its right to use the common facilities.

**15. Pleadings § 19c—**

Where the allegations of the complaint are sufficient to establish plaintiff's legal right to the relief sought upon one theory of legal liability, a demurrer *ore tenus* will not be allowed because such facts may be insufficient predicate for relief upon a different theory of legal liability.

APPEAL by defendants from *Nimocks, J.,* heard April Term, 1953, judgment 16 January, 1954, of NEW HANOVER.

Seaboard Air Line Railroad Company, hereinafter called Seaboard, is the plaintiff. Atlantic Coast Line Railroad Company, hereinafter called Coast Line, and Wilmington Bridge Company, hereinafter called Bridge Company, are the defendants.

On 25 July, 1952, Carolina Power and Light Company, hereinafter called Power Company, notified Seaboard and Coast Line, competing railroads in the Wilmington area, that it would construct in the Fall of 1952 a new power plant on the east bank of the Cape Fear River.

The estimated cost of the new power plant is between 25 and 30 million dollars. Some 378 cars of construction materials will be required. Two 100,000 kilowatt steam-electric turbines, with other necessary equipment, will be installed. Each turbine unit will burn between 15 and 20 thousand tons of coal each month, some 200,000 tons per year. For the two units, some 8,000 cars of coal will be required each year. The annual freight revenues for handling 8,000 cars of coal will be between $850,000 and $1,000,000.

The Bridge Company, a non-operating company whose stock is owned 50% by Seaboard and 50% by Coast Line, has title to certain land, rights of way, bridges and trackage. Its main trackage extends from Navassa, on the west bank of the Cape Fear, to Hilton, on the east bank of the Northeast Cape Fear, a distance of approximately two and one-half miles. Proceeding from Navassa to Hilton, or *vice versa,* necessitates crossing the bridges spanning the two rivers. The Hamlet-Wilmington line of the Seaboard and the Florence-Wilmington line of the Coast Line, in approaching Wilmington, proceed from Navassa to Hilton by way of the bridges and entire main trackage of Bridge Company.

On Bridge Company trackage between the rivers two junctions had been constructed and were in use, the Yadkin Junction and the Almont Junction. The Fayetteville-Wilmington line of Coast Line approaches Wilmington in this manner: It proceeds south between the rivers and connects with Bridge Company trackage at Yadkin Junction, runs thence over Bridge Company trackage, including that crossing the Northeast Cape Fear bridge, to Hilton, and runs thence into Wilmington. Yadkin

Junction is a Coast Line facility, used only by it. At Almont Junction, between Yadkin Junction and the Northeast Cape Fear bridge, there are *two* turnouts, serving industries located on the west bank of the Northeast Cape Fear north *and* south of the Bridge Company trackage. Almont Junction, the turnouts therefrom, the spur tracks, sidings, switches, etc., serving the several industries, are joint facilities, used by Seaboard and Coast Line.

The power plant site is at a location commonly known as "Mount Misery," on the east bank of the Cape Fear River and north of the Bridge Company trackage. The power plant site is *between* the Cape Fear River and the Fayetteville-Wilmington line of the Coast Line.

Thus, the Coast Line could construct a turnout and trackage from its Fayetteville-Wilmington line, separately owned trackage, to the power plant site; but Seaboard had no means of access to the power plant site from separately owned trackage.

Power Company wants to be served by both railroads. It proposed that Coast Line serve it by a track breaking out from its Fayetteville-Wilmington line, north of its connection with Bridge Company trackage, and that Seaboard serve it by a track breaking out from Bridge Company trackage used as part of its Hamlet-Wilmington line at a new turnout to be constructed east of the Cape Fear, *between* the Cape Fear and Yadkin Junction, the new turnout hereinafter called Power Plant Junction.

Seaboard acquired a right of way extending from Bridge Company trackage at proposed Power Plant Junction to the power plant site, and proposed that Seaboard and Coast Line build the new turnout and trackage facilities, each to bear one-half of the estimated cost of $79,007, for their joint use in providing rail service to the power plant. In addition to this Joint Proposal, Seaboard submitted an Alternative Proposal, namely, that such turnout and trackage facilities be constructed for its exclusive use in providing rail service to the power plant, Seaboard to pay the entire cost thereof.

Coast Line was not interested in either proposal. It assured the Power Company that *Coast Line* was in position to take care of *all* their requirements very satisfactorily by the turnout from its Fayetteville-Wilmington line. Having no need for the proposed turnout from Bridge Company trackage, it refused to consent to Seaboard's construction and use thereof.

Three (then) separate railroad corporations were incorporated as the Bridge Company in 1866. Each incorporator was given the right to elect two of the Bridge Company's six managing directors. Seaboard has succeeded to the position of the incorporator which owned 50% of the stock but elected only two directors. Coast Line has succeeded to the position of the two other incorporators, each of whom owned 25% of the stock and elected two directors. Thus, the stock-ownership of Bridge Company

as between Seaboard and Coast Line is evenly divided; but Coast Line elects four of the six directors. Coast Line insists that the controversy must be resolved through corporate processes of the Bridge Company. Seaboard insists that the issue is between it and Coast Line, as co-owners; and, under the provisions of Bridge Company's By-Laws, Seaboard's failure to attend meetings of stockholders or directors of Bridge Company since this controversy developed results in *no quorum* and the inability of Bridge Company to take formal corporate action. President of the Coast Line is the President of the Bridge Company. All other executive officers of the Bridge Company are Coast Line officials except the Secretary, he being an official of Seaboard. The salary of Bridge Company's president, $200.00 per year, is paid by Coast Line. The salary of Bridge Company's secretary, $200.00 per year, is paid by Seaboard. No compensation is paid to other officers of Bridge Company. Bridge Company has no employees. It conducts no operations. It has never done so. Its facilities are used by Seaboard and Coast Line. Seaboard and Coast Line pay all capital outlay in connection with Bridge Company properties, each paying one-half thereof. They pay all operating and maintenance costs, proportioned on a wheelage or user basis. The Bridge Company has no income, no bank account, etc. Its properties are treated as parts of the Seaboard and Coast Line systems.

The foregoing summary statement of Bridge Company's status illuminates the position taken by the Bridge Company, through officers who are primarily officials of the Coast Line, namely, that no turnout from the Bridge Company's trackage can be made except by mutual consent of Bridge Company's co-owners, Seaboard *and* Coast Line, and that since Coast Line has refused to give its consent the Bridge Company cannot permit such turnout. The position thus taken by Coast Line, if maintained, will operate to bar Seaboard from providing railroad service to the power plant and deprive the Power Company of the benefits of competitive railroad service.

Seaboard commenced this action 10 October, 1952. At a preliminary hearing, held 22 October, 1952, upon return of a show cause order, judgment was entered enjoining and restraining the defendants, among other things, from interfering with the construction and use by Seaboard of a track breaking out of the main track of the Bridge Company to reach and serve the power plant site, and requiring the defendants to permit the plaintiff to operate over the trackage of the Bridge Company, in order to reach, construct, use and maintain the said turnout and the trackage constructed by plaintiff to connect therewith. Defendants appealed to this Court.

After entry of the judgment of 22 October, 1952, the Seaboard commenced construction of the turnout and track. It was in service on or

before 27 January, 1953, but was not completed until the week of 6 April, 1953. The Coast Line commenced construction of the track from its Fayetteville-Wilmington line to the power plant site. It was in service 6 January, 1953, and completed in February, 1953.

The trackage so constructed by the Seaboard extends north from the new Power Plant Junction on Bridge Company trackage 6,220 feet to the power plant site. Primarily on account of the terrain, the actual cost came to $133,497.

The main track, constructed by the Coast Line from its Fayetteville-Wilmington line to the power plant site, a distance of 4,743 feet, together with two set-off tracks included in the project, cost $53,159.77.

This Court, upon defendants' appeal from the temporary restraining order of 22 October, 1952, held that "the mandatory provisions of the restraining order were improvidently entered" at *such preliminary hearing;* and the cause was remanded for trial on the issues raised by the pleadings. *R. R. v. R. R.,* 237 N.C. 88, 74 S.E. 2d 430. On this former appeal, *Devin, C. J.,* summarized the allegations of the complaint. On 27 February, 1953, Burney, J., entered an order dissolving and vacating, *in toto,* the restraining order of 22 October, 1952, and requiring the Seaboard to restore the Bridge Company's properties to their condition on 22 October, 1952. Seaboard appealed therefrom, this appeal was withdrawn, presumably to expedite trial in the court below on the merits. Meanwhile, the mandatory provisions of Judge Burney's order were suspended but Seaboard's *use* of the turnout and track was stayed.

So that, when the cause was before Nimocks, J., at April Term, 1953, the Seaboard's turnout and track had been completed and was ready for use but had not been used for the movement of freight to the power plant site. The Coast Line's turnout and track had been completed; and, as of April Term, 1953, the Coast Line had delivered over it to the power plant site 128 cars of construction materials.

At April Term, 1953, the parties waived jury trial, offered evidence; and, at the conclusion of the hearing, stipulated that Nimocks, J., was authorized to find the facts and render judgment in or out of term and in or out of the district. Judgment was entered 16 January, 1954. In addition to findings of fact embodied in the judgment, the court below made one hundred and eighty-seven specific findings of fact. Defendants interposed exceptions to forty-five of these specific findings, the ground assigned being: "For that it has no evidence to support it, or it is plainly contrary to the weight of the evidence." After setting forth eight separate findings, reflecting the court's ultimate findings of fact and conclusions of law, the judgment provides:

"It is Ordered, Adjudged and Decreed that the defendant Atlantic Coast Line Railroad Company and its agents, servants and employees,

and the defendant Wilmington Railway Bridge Company, its agents, servants and employees, and each of said defendants and the agents, servants and employees of each of said defendants be, and they hereby are enjoined and restrained

"(a) from interfering with the construction and maintenance by the plaintiff of the turnout in the main line of the defendant Wilmington Railway Bridge Company which the plaintiff has constructed at a point approximately 2,446 feet northerly and easterly (as measured along the center line of the said Bridge Company's main line) from the easterly end of the Bridge Company's bridge over the Cape Fear River, and of the track leading therefrom upon the right of way of the said Bridge Company, and of the facilities appurtenant thereto;

"(b) from interfering with the operation by the plaintiff over the trackage of the defendant Wilmington Railway Bridge Company to reach and use the turnout and track described in paragraph (a) above, subject to the same operating rules and requirements as are applicable to the operation by plaintiff to reach and use the Almont Spur; and it is further

"ORDERED, ADJUDGED AND DECREED that the defendants have suffered no damage and sustained no injury on account of or by reason of the issuance of the temporary injunction by his Honor Leo Carr, dated October 22, 1952, and that no liability has accrued on the bond filed in this cause by the plaintiff in the penal sum of $50,000 with the National Surety Corporation as surety, and that said bond be and the same is hereby cancelled, and that no further liability or responsibility may accrue on account of the same.

"Let the cost of this action be taxed by the Clerk Against the defendant Atlantic Coast Line Railroad Company."

Defendants appeal.

Additional relevant facts will be stated in the opinion.

*Varser, McIntyre & Henry and James B. McDonough, Jr., for plaintiff, appellee.*

*M. V. Barnhill, Jr., and F. S. Spruill for defendant Atlantic Coast Line Railroad Company, appellant.*

*Hogue & Hogue for defendant Wilmington Railway Bridge Company, appellant.*

BOBBITT, J.   Is Seaboard entitled as a matter of right, upon the facts established, to use the turnout from Bridge Company trackage at Power Plant Junction to serve the power plant and so compete with Coast Line, notwithstanding Coast Line has no need or desire to make joint use thereof and notwithstanding its refusal to consent to the construction and use thereof by Seaboard? If it has such legal right, Seaboard will suffer

irreparable injury unless Coast Line is enjoined from wrongful inter-
ference with Seaboard's exercise of such legal right; for such equitable
relief alone will afford Seaboard a plain, adequate and complete remedy.

Coast Line insists that Seaboard cannot use the Bridge Company's
properties, in the absence of its consent, to its detriment; and the detri-
ment contemplated is an impairment of what it contends to be its exclu-
sive right to serve the power plant.

While the Power Company's business is the cause of the present con-
troversy, if Coast Line's position prevails Seaboard will be precluded
from serving not only the power plant but any other industrial plant now
or hereafter established in the area between the Fayetteville-Wilmington
line of the Coast Line and the Cape Fear River. The result would give
Coast Line a monopoly of freight service in this area by effectively elimi-
nating competition. The turnout at Power Plant Junction, breaking out
from Bridge Company trackage, and the spur track therefrom to the
power plant, is the only feasible way available to Seaboard to serve the
power plant and other industries located in this area. This area, once a
barren wasteland, shows promise now of becoming a present-day Meso-
potamia.

Seaboard and Coast Line have separately owned tracks, yards and other
facilities in the City of Wilmington. The separate Wilmington facilities
of each connect with Bridge Company trackage at Hilton.

Coast Line *now uses* Bridge Company trackage to serve the power
plant. Whether routed over its Fayetteville-Wilmington line, or over its
Florence-Wilmington line, inbound cars of materials and of coal destined
for the power plant are brought *via* Bridge Company trackage to Coast
Line's Wilmington yards. Thereafter, such cars are moved by Coast Line
switch engine over Bridge Company trackage to Yadkin Junction, thence
on the Fayetteville-Wilmington line to Coast Line's turnout, thence on
Coast Line's trackage to the power plant.

Under Seaboard's *present usage,* in accordance with the judgment of
the court below, inbound cars of materials and coal on its Hamlet-Wil-
mington line, destined for the power plant, are brought *via* Bridge Com-
pany trackage to Seaboard's Wilmington yards. Thereafter, such cars
are moved by Seaboard switch engine over Bridge Company trackage to
Power Plant Junction, then over Seaboard's turnout and trackage to the
power plant.

Coast Line has refused to accord to Seaboard reciprocal switching
privileges. If such privileges were accorded, Seaboard could deliver its
cars to Coast Line's yards in Wilmington and then, *for a switching charge,*
Coast Line would switch Seaboard's cars to the power plant. While not
the basis of decision, this attitude is illustrative of Coast Line's insistence
upon monopolistic privileges within the power plant area.

While the record and exhibits are too voluminous to discuss in detail, some further statement of relevant facts is requisite to a full appreciation of the basis of decision. The facts stated herein, upon which decision is based, are either admitted or are findings of fact by the court below supported by competent evidence. In either event, they are deemed conclusively established. *Burnsville v. Boone,* 231 N.C. 577, 58 S.E. 2d 351.

By ordinance of the Convention of 1866 "The Wilmington and Weldon Railroad Company," "The Wilmington and Manchester Railroad Company," and "The Wilmington, Charlotte and Rutherfordton Railroad Company," their associates and assigns, were "created and constituted a body politic and corporate, for the term of ninety years, by the name and style of 'The Wilmington Railway Bridge Company.'" In addition to corporate powers conferred by general statutes relating to corporations, it was expressly authorized to construct and erect bridges over the Cape Fear (then called north-western branch of the Cape Fear) and the Northeast Cape Fear rivers; to lay railroad tracks on the bridges; to connect such bridge tracks by railroad tracks running from one bridge to the other; and to extend and continue such a railroad on the east side of the Northeast Cape Fear to form a connection in Wilmington with the lines of the Wilmington and Weldon Railroad Company. By amendment, Acts of 1866-7, Chap. CXIII, the Bridge Company was authorized to connect with the lines of each of its three incorporators.

The Bridge Company, and each of the three incorporators, were authorized and empowered, "acting jointly and severally," to borrow money and to secure payment by a lease or mortgage of the Bridge Company's entire property.

Coast Line stresses a resolution adopted by the Board of Directors of the Bridge Company at its first meeting held 6 September, 1866, providing: "Any alteration of the general route surveyed by M. P. Muller and adopted by this Board shall not be made unless the consent of each of the companies constituting this Corporation shall be previously obtained thereto." It will be observed that this resolution antedated the construction of the bridges and of Bridge Company's main trackage and plainly referred to the location thereof. We are not concerned in this controversy with the construction or location of additional Bridge Company trackage but only with the use to be made of its facilities by "the companies constituting" the Bridge Company.

The original incorporators subscribed to Bridge Company's capital stock as follows: Wilmington, Charlotte and Rutherfordton, $20,000 (50%); Wilmington and Weldon, $10,000 (25%); Wilmington and Manchester, $10,000 (25%).

By agreement between them, 8 November, 1866, they agreed to pay ½, ¼ and ¼, respectively, the current expenses and maintenance costs of

the Bridge Company's properties and the interest and principal of the Bridge Company's funded indebtedness, consisting of $400,000 of bonds *endorsed* by the incorporators. The sale of these bonds provided the funds for construction of the bridges, tracks, etc.

Since the Bridge Company's sole reason for existence was to provide facilities (bridges and trackage) for use by its incorporators, their actions in becoming "the companies constituting" the Bridge Company, their subscriptions to its capital stock, their actions in becoming obligated for its indebtedness, and their contract *inter se* with reference to proportional payment *by the incorporators* of the capital outlay and current expense obligations of Bridge Company, show clearly that the basis for these dealings was the understanding and agreement that these incorporators, operating railroads, and their successors, had equal rights, *inter se,* as to user of Bridge Company facilities. Such user rights, predicated on contract, arose by clear implication. What is said by *Mack, Circuit Judge,* in *Great Lakes & St. L. T. Co. v. Scranton Coal Co.,* 239 F. 603, a case involving a different factual situation, is pertinent here:

"Precedent can throw but little light on the sound interpretation of such contracts, especially as to implying unexpressed obligations: each has its own individuality, its own background and surrounding circumstances. Words are only symbols, and at times, even in the most formal agreement, but elliptical expressions of the mutual understanding; the underlying mutual intent, sought by both parties to be clothed in the language used, must be ascertained; text, context, and extrinsic circumstances, including prior negotiations and relations, may be considered to enable the court to view the matter from the standpoint of the parties at the time of making the contract."

During the period of 1867 to 1 November, 1869, the Bridge Company built the bridges and constructed trackage from Navassa to Hilton. It was during this period of tripartite ownership that the Cape Fear and Yadkin Valley Railroad Company was authorized to build its Fayetteville-Wilmington line. (See Ch. 190, Laws of 1883.) The Cape Fear and Yadkin Valley approached Wilmington *between* the two rivers; and, in order to enter Wilmington, it had to connect with the Bridge Company trackage. Not being an incorporator of Bridge Company, or successor to such incorporator, the Cape Fear and Yadkin Valley had to obtain authority to connect with and to use the Bridge Company trackage. By contract of 3 December, 1889, approved by the stockholders and directors of the Bridge Company, Cape Fear and Yadkin Valley was permitted to make use of Bridge Company trackage for such purpose. Under this contract, Yadkin Junction was established. The Cape Fear and Yadkin Valley was acquired by Wilmington and Weldon (later Coast Line) in 1899. See *Manning v. R. R.,* 188 N.C. 648, 125 S.E. 555. It is note-

worthy that the present Fayetteville-Wilmington line of the Coast Line, from which its turnout to the power plant was constructed, was not in existence when Bridge Company built its bridges and main tracks.

Coast Line contends that Bridge Company built its bridges and its tracks as authorized by its charter and thus exhausted its statutory powers; hence, Coast Line contends, permission by Bridge Company to Seaboard to construct the turnout at Power Plant Junction would be *ultra vires.* The position is predicated upon the fact that Bridge Company's charter makes no mention of *any* turnout. The contention is without merit. If such be *ultra vires,* the contract permitting the construction and use by Cape Fear and Yadkin Valley (now Coast Line) of the turnout at Yadkin Junction is equally *ultra vires.* The purpose of the Bridge Company was not to limit railroad traffic but to encourage and facilitate railroad traffic for the benefit and industrial development of the Wilmington area and of the entire State. When Bridge Company was organized, the immediate need was to enable Wilmington, Charlotte and Rutherfordton and Wilmington and Manchester to cross the rivers and connect in Wilmington with Wilmington and Weldon. Bridge Company, by express charter provision, was authorized to connect with the lines of each of its three incorporators. But we cannot accept the view that such authorization extended only to lines of the incorporators previously constructed and then in use. For the plain intent was that this jointly owned facility was for the use and benefit of the incorporators in the development and expansion of *their* facilities and operations in respect to their future as well as their immediate needs. Compare, *St. Louis, K. C. & C. R. R. Co. v. W. R. R. Co.,* 217 U.S. 247, 30 Sup. Ct. 510, 54 L. Ed. 752. Railroads have authority under general statute to provide "turnouts, sidings, and switches" to serve industrial plants along or near their main lines. G.S. 60-37 (7). In the absence of express statutory or charter authorization, the power to construct a railroad includes authority to construct such spur, industrial, switching and other auxiliary tracks as may be necessary to serve the public needs along or near the main line. 44 Am. Jur. 450, Railroads, sec. 231.

Coast Line became the legal successor of Wilmington and Weldon and of Wilmington, Columbia and Augusta (originally Wilmington and Manchester) in 1900. Prior thereto, these developments are noteworthy:

1. In 1892, the Bridge Company acquired the right of way for a spur track to a fertilizer factory. The cost of this construction was met in part by the sale of four of Bridge Company's second mortgage bonds. The balance was paid "by the three companies interested as stockholders in this Company, in the usual proportion." This is the origin of the Almont Spur or Junction, a turnout from Bridge Company trackage to serve industries along the west bank of the Northeast Cape Fear.

2. In 1892, the then bonded indebtedness of $210,000 was refunded by a new issue of 50-year Consolidated Bonds, guaranteed by the (then) three proprietary companies. These were paid 1 April, 1943, at maturity, half by Seaboard and half by Coast Line.

3. In 1894, the original spur from Almont Junction was extended to serve a new industry.

After Coast Line's acquisition of the rights, franchises, property, etc., of its said two predecessors, Coast Line and Seaboard made certain contracts, the Bridge Company being a party thereto, which modified in certain particulars the contract of 8 November, 1866, between the original incorporators. Except as modified, the original contract of 8 November, 1866, was to remain in force and effect. The more important later contracts will be considered.

Under the contract of 22 May, 1909, it was provided "that the Coast Line Company and the Receivers (of Seaboard), or their successors, shall have charge and control of the operation and maintenance of the bridges and railway property of the Bridge Company alternately for a period of five years each, first period of operation to be assumed by the Coast Line Company to commence on the first day of July, 1909, and to continue for five years thence next ensuing." Previously, the proprietary roads had an arrangement whereby they alternated in respect to the actual control and operation of Bridge Company trackage.

In respect of the cost of improvements, additions and replacements made upon the bridges and railway property of the Bridge Company, and in respect of the bonded indebtedness, no change was made; for these obligations were to be paid on the basis of the respective stock holdings of the Coast Line and of Seaboard, to wit, 50% each.

However, in lieu of the original agreement that operation and maintenance costs were to be paid in proportion to respective stock holdings, an entirely different plan was adopted. It was provided that all operation and maintenance costs, including salaries, supplies, repairs, taxes, insurance, etc., were to be *apportioned* between Coast Line and Seaboard on a user or wheelage basis. A schedule was provided for determination of the proportion to be paid by each railroad. Thus, each car in freight or passenger trains moving over the whole length of the Bridge Company's track was to count as one car while each freight, passenger or yard engine making the same trip was to count as two cars. Another item in this schedule was worded as follows: "Each freight and passenger car moving over the Bridge Company's track between Hilton and Yadkin Junction and intermediate points to count . . . ½ car."

Express provisions, set forth in detail, provide for the responsibility of the Coast Line Company and the Receivers (of Seaboard), and their successors, as between themselves, for the defense and payment of all

claims, etc., "accruing for loss or injury either to person or estate, arising out of the operation of the tracks, or other property, *to be used jointly,*" etc. (Emphasis added.)

It was provided in the contract of 22 May, 1909, "that all questions and disputes between the parties hereto, *as to the proper meaning and interpretation of this supplemental agreement,* shall upon request of either the Receivers (of Seaboard) or the Coast Line Company, made to the other in writing, be referred for settlement to a board of arbitrators," to be constituted as specifically provided. (Emphasis added.) The term of the contract of 22 May, 1909, was 15 years.

A supplemental agreement was made 25 May, 1926, between Seaboard, Coast Line and Bridge Company. By its terms, the contract of 22 May, 1909, was continued in effect from year to year until canceled by either Seaboard or Coast Line by giving at least a year's notice to the other parties. The operation and maintenance of the bridges and property was assumed by the Coast Line during the continuance of this supplemental agreement. However, the Seaboard was given the right to assume such operation and maintenance at any time within five years from the date of the supplemental agreement by giving at least one year's prior written notice to the other parties hereto of its desire so to do.

The *item* listed in the contract of 22 May, 1909, as the basis for determining the wheelage or user to be charged to each party, *quoted above,* was modified so as to read as follows: "Each freight and passenger car moving over the Bridge Company's track between Hilton and Yadkin Junction and intermediate points, and each freight and passenger car moving between Navassa and Yadkin Junction and *intermediate* points will be counted as one-half car in pro rating the expense." (Emphasis added.)

This single specific modification suggests that the parties in 1926 contemplated that there would be new industrial plants located on the east bank of the Cape Fear, to be served by a junction, turnout and spur breaking from the Bridge Company trackage between Navassa and Yadkin Junction similar to the Almont Junction, turnout and spur. Only in such case, would there be intermediate points between Navassa and Yadkin Junction.

By contract of 20 April, 1931, Seaboard waived "the taking over of the operation and maintenance of said bridges and railway property on May 1, 1931, with understanding that the Seaboard Air Line Railway Company, its Receivers, or their respective successors or assigns in interest under the contract, shall have the option, by giving to the Atlantic Coast Line Railroad Company ninety (90) days written notice in advance, to take over such operation and maintenance on May 1, 1936, and/or at the end of any five-year period thereafter so long as the con-

tract continued in effect: and should said option be exercised at any time or from time to time the Seaboard Air Line Railway Company, its Receivers, or their respective successors or assigns in interest under the contract, shall operate and maintain said bridges and railway property for a period of five years, but at the expiration thereof the next succeeding five-year period of operation and maintenance shall be taken over by the Atlantic Coast Line Railroad Company." The current five-year period of operation by Coast Line extends until 1 May, 1956.

After the Coast Line acquired the franchise, properties, etc, in 1900, of Wilmington and Weldon and of Wilmington, Columbia and Augusta (originally Wilmington and Manchester), various tracks were provided for industries north and south of the Bridge Company trackage, accessible from the Almont Junction. We deem it unnecessary to review the voluminous correspondence dealing with each of these. In some instances, the Seaboard took the initiative in the construction of a spur track or siding. In other instances, the initiative was taken by the Coast Line. For limited periods, certain tracks were used by one road alone. Eventually, however, whether the title was in Bridge Company, Seaboard or Coast Line, or in Seaboard and Coast Line jointly, joint ownership and joint use was agreed upon. The same applies to trackage serving industries at Navassa. We find nothing in the correspondence that helps us in the resolution of the question here presented. Usually, the road taking the initiative was encouraging the other to participate in the venture by paying its proportionate part of the cost. But the power plant differs from previously established industries thus jointly served. It is an understatement to say that the power plant is not an ordinary industrial plant in relation to its freight service requirements.

The operation of the Bridge Company trackage, under the exclusive control of the Coast Line until 1 May, 1956, is handled in this way.

"Operation of trains, engines and cars over the Bridge Company's main line trackage is controlled by what is known as an absolute block.

"No train or engine is permitted to enter upon the Bridge Company's main line at Navassa, Yadkin Junction, Almont Junction or Hilton without first coming to a full stop, and having a member of the train crew get permission to proceed, which is known as getting the block.

"There are telephone booths at each of those points with telephones that are connected with the office of the Coast Line's train dispatcher at Wilmington.

"The member of the train crew at present telephones the Coast Line's train dispatcher to get the block.

"The train or engine then proceeds on the Bridge Company's main line. When it leaves the main line a member of the train crew telephones the

dispatcher and releases the block. In the meantime, the dispatcher permits no other movement upon the Bridge Company's main line.

"The point at which the track constructed by the Seaboard to reach and serve the power plant breaks out of the main line of the Bridge Company was designated as 'Power Junction.'

"When the Seaboard constructed the turnout at Power Junction it erected a telephone booth at that point in which it installed a telephone and connected the same with the same telephone circuits as the telephones at Navassa, Yadkin Junction, Almont Junction, and Hilton."

The train crew using Power Plant Junction contacts the Coast Line's Dispatcher to "get the block." This is incident to Coast Line's control of operations of Bridge Company facilities until 1 May, 1956. In the event Seaboard takes over control of operations then, Seaboard's Dispatcher will "give the block" to the train crew using Power Plant and other junctions. The railroad having control of operations at any particular time has the burden of providing the Dispatcher and of directing from his office the movement of trains; but, even so, the expense thereof is an operation expense of the Bridge Company to be apportioned in accordance with the wheelage formula.

The Bridge Company was organized and its rights of way acquired and its construction program completed in the years immediately following the close of the Civil War. In North Carolina, railroad financing was difficult. Three railroads were authorized to go into Wilmington. Only the Wilmington and Weldon could reach Wilmington. Its line into Wilmington was east of the Northeast Cape Fear. No connection could be made between it and the two lines approaching from the west and terminating on the west bank of the Cape Fear. Bridges spanning two rivers were required. The Bridge Company was the means by which the three railroad companies at their joint expense could expand and improve their facilities. In effect, the Bridge Company bridges and tracks became a part of the line of each of the railroads entering Wilmington from the west. Cross over the bridges, says the Coast Line, but there is nothing denominated in the bond that gives you the right to break out from this jointly owned trackage to serve industrial plants between the rivers. We have acquired the Cape Fear and Yadkin Valley, which has a line between the rivers; and its contract with Bridge Company back in 1889 gave the Cape Fear and Yadkin Valley the right to connect with Bridge Company trackage. All parties consented to that. That's our Fayetteville-Wilmington line. Thus, we can use the Bridge Company facilities in serving the power plant. But just because the Bridge Company, through its stockholders gave consent to that arrangement, doesn't mean that we have to give consent that Seaboard break out from Bridge Company trackage at Power Plant Junction and thus use Bridge Company

facilities in serving the power plant, to our detriment, *i.e.,* so that we will be deprived of a monopoly of the power plant business.

The position is lacking in realism. It ignores the fact that the manifest purpose for the organization of Bridge Company was to enable the incorporators thereof to expand their railroad facilities in order that public requirements for better service might be met. The incorporators were operating railroad companies. Bridge Company was not an operating railroad company. Stock ownership alone does not give Seaboard its right of user of Bridge Company bridges and trackage. The key factor is that the underlying and sole reason for the creation and existence of Bridge Company was to afford joint and equal use of the facilities to its incorporators, to wit, "the companies constituting" the Bridge Company, and their successors, as a constituent part of their operating railroad systems. Therefore, the right of each incorporator, and of its successors, to the use of such joint facilities and trackage is derived from the nature and circumstances of the original incorporation of Bridge Company and implemented by the contract of 8 November, 1866, not from stock ownership or from contract with the Bridge Company as a separate corporate entity. Compare, *Chicago, M. & St. P. R. Co. v. Des Moines U. R. Co.,* 254 U.S. 196, 41 S. Ct. 81, 65 L. Ed. 219.

The Bridge Company was not organized to engage in business. Its original incorporators, and their respective successors, were not stockholders in the ordinary sense. They expected and received no dividends. What the original incorporators did acquire, to which Seaboard and Coast Line have succeeded, was the right of each to use the Bridge Company facilities; and no corporate action, by stockholders or directors, could deprive any incorporator, or its successor, from the use of the Bridge Company facilities, subject to a similar right in the other(s), in the operation of its railroad system. Thus, the Bridge Company facilities became an integral part of each system; and the right of each incorporator, and its successor, to equal rights in the use thereof springs from the nature of the original incorporation, confirmed by usage and course of dealings across the years. The owner-railroads built and maintained the bridges and the trackage for their use, as part of their respective railroad systems; and the Bridge Company has been and is the corporate agency or device through which they share both the capital outlay and the operational costs. This view is in accord with the following, quoted from the Court's statement of facts in *Wilmington Railway Bridge Co. v. Comrs. of New Hanover County,* 72 N.C. 15 (16): "The plaintiff corporation owns no rolling stock or property of any kind other than its franchise, in connection with the line of road and the bridges before referred to, *which are in fact part of the lines of the two companies mentioned,* the exclusive use thereof being vested in said companies in perpetuity, by a formal

covenant and agreement entered into some years ago between the said railroad companies and the plaintiff." (Emphasis added.) Also, in 1922, the U. S. General Director of Railroads was notified, pursuant to resolution of the stockholders of Bridge Company, that the Bridge Company's property was owned and operated "as a joint facility by and for the benefit of its owner lines," Coast Line and Seaboard.

We cannot regard Seaboard and Coast Line as stockholders in the ordinary sense. They are co-owners of a facility which is in existence for their joint use. While in *Chicago, M. & St. P. R. Co. v. Minneapolis C. & C. Asso.,* 247 U.S. 490, 38 Sup. Ct. 553, 62 L. Ed. 1229, the co-owners of a joint facility were acting in concert to use such facility as a means of exacting higher charges, statements from the opinion are applicable here. Ordinary rules relating to stock ownership have no application, says *Mr. Justice Clarke,* ". . . where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. . . . In such a case the courts will not permit themselves to be blinded or deceived by mere forms of law, but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

We do not suggest that Bridge Company is without significance as a separate corporate entity. Through corporate meetings, formal actions relating mainly to financing, taxes, execution of mortgages, deeds, etc., have been taken. Such actions, involving dealings with third parties, are binding upon the corporation and its stockholders. But controversies between its co-owners, which draw into focus their rights, *inter se,* as to user of Bridge Company facilities may not *be resolved* through ordinary corporate procedures. Such differences as have arisen in the past were resolved by negotiations resulting in agreement. After agreement was reached, the stockholders and directors of Bridge Company authorized such action as was appropriate to implement the *previously reached agreement* of the co-owners. Unfortunately, the co-owners did not reach agreement on the subject of the present controversy. Consequently, the Court must adjudicate their respective rights, *inter se.*

There is persuasive support for the position that each of the owner-railroads is entitled to the use of Bridge Company facilities as a part of its railroad system by the construction and use of a new turnout from Bridge Company trackage, such as that at Power Plant Junction, subject to limitations such as : first, when reasonably necessary to do so to provide service to the public, including industrial plants; second, when it accords the other the privilege, upon payment of one-half the cost, to share equally

in the use thereof; and third, when it does not substantially impair the usage thereof by the other railroad. If this test were applied, Seaboard, upon findings of fact supported by competent evidence, would be clearly entitled to construct and use Power Plant Junction as its turnout from Bridge Company trackage to the power plant.

But adoption of the position stated above is unnecessary upon the record before us. In any event, neither the Seaboard nor the Coast Line has any right superior to the other to use the Bridge Company's facilities. Each has equal right to use such facilities for the same purposes and in substantially the same manner as the other. Coast Line in fact now uses such facilities to serve the power plant. True, its lines are so located that it can use the Yadkin Junction turnout, not available to the Seaboard. But this does not mean that Seaboard, because of the location of its separately owned lines, is precluded from making a use of Bridge Company trackage similar to that now made by Coast Line. Equal user is not restricted to identical user. The new junction and turnout (Power Plant Junction) afford Seaboard a right of user of Bridge Company facilities similar in character, purpose and operation to that made by Coast Line.

As stated above, the inbound cars of both lines move over Bridge Company trackage into their respective. Wilmington yards and thereafter move again by switch engines to the respective junctions and thence to the power plant. To accord Coast Line the sole right to use the Bridge Company trackage in such manner and for such purpose would be a denial of a corresponding right to Seaboard to use Bridge Company trackage in violation of what was contemplated when Bridge Company was incorporated, namely, equal rights in the use of a joint facility intended for use and since used as a constituent part of the railroad system of each incorporator and its successor.

Operation of Seaboard's Power Plant Junction will not impair the usage of Bridge Company trackage by the Coast Line. Seaboard's Power Plant Junction will function in like manner with Coast Line's Yadkin Junction and the joint Almont Junction. The block signal system will operate in like manner. Computation of Seaboard's proportion of operation and maintenance costs will be made in accordance with contract of 22 May, 1909, as modified by the contract of 25 May, 1926. Power Plant Junction is an intermediate point between Navassa and Yadkin Junction. Provisions as to liabilities, *inter se,* as set forth in the contract of 22 May, 1909, with reference to injuries and damages caused by operations, are appropriate. The same number of cars will break into and break out of Bridge Company trackage. The only difference is that some will consist of freight handled by Seaboard and some (but not all) by Coast Line. Too, this construction of the legal rights of Seaboard and of Coast Line, *inter se,* is in accord with (1) the status of Bridge Company both orig-

17—240

inally and now as a cooperative venture for the equal benefit of the owner-railroads, and with (2) the public interest, *i.e.,* competition rather than monopoly.

Railroads are *quasi*-public corporations, created to serve primarily the public good and convenience. As such they exercise public franchise rights, including that of eminent domain. G.S. 40-2. And, as stated by *Clark, C. J.,* in *R. R. v. R. R.,* 161 N.C. 531, 78 S.E. 68: "As a matter of public policy, the State encourages competition among common carriers so that the public may have resulting benefits." See G.S. 60-60. Nor will one railroad corporation be permitted to thwart the efforts of another to render railroad service on a competitive basis by refusal to allow it reasonable use of its own right of way and trackage. Under the statute now codified as G.S. 60-37, one railroad corporation was adjudged entitled to condemn a right to use another railroad corporation's right of way for the purpose of operating a parallel track thereon from which competitive service could be provided, there being no substantial interference with the operating facilities of the other railroad. *R. R. v. R. R.,* 83 N.C. 489. In *Corporation Com. v. R. R.* (Industrial Siding Case), 140 N.C. 239, 52 S.E. 941, under the statute now codified as G.S. 62-45, it was held that the Corporation Commission had authority to require the construction of a sidetrack to serve an industry. And in *R. R. v. R. R., supra,* under the statute now codified as G.S. 60-37, one railroad was held entitled to condemn a right to cross the right of way and track of another railroad in order that it might reach industrial plants and provide competitive railroad services. See *R. R. v. R. R.,* on rehearing, 165 N.C. 425, 81 S.E. 617.

Where practicable, and the prospect of profitable operation exists, the public interest requires that industrial plants be provided with competitive service. It is quite clear that the Power Plant contemplated and now desires such competitive service.

Assume no railroad line approached Wilmington between the rivers. Undoubtedly, the Utilities Commission would have authority to require both Seaboard *and* Coast Line to construct sidetracks to industries established between the rivers where there was a prospect of profitable operations, to the end that competitive service be provided. True, the statute limits the distance to 500 feet when such construction *is required* by order of the Utilities Commission. This is unimportant in this connection. The right to break out from the Bridge Company trackage to construct industrial spurs, sidetracks, etc., is here involved. Would the authority of the Utilities Commission be limited by the circumstance that the Coast Line can reach the power plant without breaking out from the Bridge Company trackage? On the contrary, in the public interest, it would be its duty to provide competitive service, assuming the prospect of profit-

able operation. Too, it would seem that, in the absence of a present legal right to use the Power Plant Junction as authorized by the judgment below, Seaboard would have the right to condemn such right of user in a properly constituted condemnation proceeding. Be that as it may, we are not dealing presently either with an order of the Utilities Commission or with a judgment in a condemnation proceeding; and under our decision action by the Utilities Commission or by condemnation proceeding is unnecessary.

Coast Line insists that Seaboard's sole remedy is to invoke the arbitration provisions of the contract of 22 May, 1909. There are at least two answers to this position. In the first place, each party thereto has the right, not the duty, to invoke the arbitration provisions; and neither has done so. In the second place, the arbitration clause concerns "questions and disputes as to the proper meaning and interpretation of this supplemental agreement." Since the subject matter of this controversy is not comprehended by the terms of the contract of 22 May, 1909, the arbitration provisions are inapplicable.

The Bridge Company demurred *ore tenus* in this Court on the ground that the complaint fails to allege facts sufficient to constitute a cause of action. The ground assigned is that Seaboard, being a stockholder of Bridge Company, could not sue Bridge Company without first exhausting its rights as stockholder within the corporation. The position is untenable. The law will not require a vain thing. Bridge Company and Coast Line, through persons who acted for both, denied Seaboard's right to construct Power Plant Junction, turnout and trackage.

The Bridge Company has no independent status or interest. Whatever the outcome of this controversy between its co-owners, the Bridge Company stands neither to gain nor to lose. It receives no revenues, pays no bills. Again, we advert to the fact that the co-owners pay no charge to the Bridge Company for the use of its facilities. As to operational and maintenance costs they pay *its* bills in the *proportion* determined on the wheelage or user basis and each pays 50% of its capital outlay costs. It holds legal title to properties. But in essence it is simply used by Seaboard and Coast Line, its co-owners, as a device to work out details of the usage of the jointly owned facilities. It is an instrumentality of its co-owners. Their rights, *inter se,* in respect of the use of the Bridge Company facilities, do not depend upon action of stockholders and directors within the corporate form. As heretofore observed, they spring from the nature of the original incorporation, confirmed by usage and course of dealings across the years. Seaboard's position is predicated upon legal rights vested in it as successor to an incorporator. Its position is quite different from a stockholder whose right springs solely from stock ownership.

A further contention of Coast Line, stressed upon the oral argument, has not been overlooked. Coast Line contends that the complaint is predicated upon allegations that Coast Line, during the current period when it has operational control of Bridge Company facilities, is an active trustee in respect to properties the title to which is held by Bridge Company as passive trustee, and that Coast Line's refusal to permit Seaboard to use the Power Plant Junction is arbitrary and in breach of trust. True, the complaint contains such allegations. But the facts alleged plainly disclose that Seaboard's case is grounded upon its legal right to use Bridge Company facilities in connection with Power Plant Junction. In fact, this is the basis assigned for the alleged trust. So, stripped of legal conclusions relating to a trust theory, the substance of the complaint is that Coast Line's officials and employees, presently in control of the operation of Bridge Company properties, wrongfully interfered with the exercise by Seaboard of its legal right to use Power Plant Junction as its means of serving the power plant.

No decision has been called to our attention or found in our own research that is sufficiently analogous on the facts to constitute a precedent of substantial help. Apparently, this case is *sui generis*. However, we have examined each of the authorities cited. In so doing, our experience was similar to that expressed by Samuel Johnson in the preface to his famed dictionary:

"I saw that one inquiry only gave occasion to another, that book referred to book, that to search was not always to find, and to find was not always to be informed; and that thus to pursue perfection was, like the first inhabitants of Arcadia, to chase the sun, which, when they had reached the hill where he seemed to rest, was still beheld at the same distance from them."

While discussion of each assignment of error would be unduly tedious, all assignments of error have been considered; and there is none of merit sufficient to warrant another hearing or a different result.

For the reasons stated, we conclude that, upon findings of fact supported by sufficient competent evidence, the judgment is correct in law and should be

Affirmed.